George BARTHOLOMEW, Gregory Glynn

v.

INSURANCE COMPANY OF NORTH AMERICA, St. Paul Fire and Marine Insurance Company, Appalachian Insurance Company and Affiliated FM Insurance Company.

Civ. A. No. 76–0343.

United States District Court,
D. Rhode Island.

Nov. 4, 1980.

Harry W. Asquith, Edward W. Moses, Providence, R. I., Francis J. O'Rourke, Boston, Mass., for plaintiffs.

Kenneth P. Borden, Providence, R. I., for defendants.

## MEMORANDUM AND ORDER

PETTINE, Chief Judge.

This is a diversity action brought by plaintiffs, residents of Massachusetts and Connecticut, against four insurance companies, none of which are incorporated in or have their principal place of business in either of these two states.[1]  The question

---

1.  Insurance Co. of North America is a Pennsylvania corporation with its principal place of business in that state.  St. Paul is a Minnesota corporation with its principal place of business in Minnesota.  Appalachian and Affiliated are Rhode Island corporations with their principal place of business in Rhode Island.

presented is which of the defendant insurers (if any) is liable for a $300,000 judgment obtained by the plaintiffs against New England Robo–Wash, Inc. and Robo–Wash Inc. The latter are two related corporations, one or both of which were insured by each of the defendant companies at some point during the period from 1971 to 1975.

Insurance Company of North America ("INA") and St. Paul Fire and Marine Insurance Company ("St. Paul") have settled with plaintiffs, and the claims against them have been dismissed with prejudice. The claims against the remaining two insurers, Appalachian Insurance Company ("Appalachian") and Affiliated FM Insurance Company ("Affiliated") are before the Court on cross motions for summary judgment. An agreed statement of facts has been submitted by the parties. For the reasons given below, defendants' motions for summary judgment are hereby granted, and plaintiffs' motion is denied.

### The Facts

In 1971, George Bartholomew and Gregory Glynn formed a partnership to open an automated carwash in Willamantic, Connecticut. Bartholomew, who had experience in the carwash business, proposed that they obtain the necessary equipment from New England Robo–Wash, Inc. ("New England Robo"). Accordingly, the partners contracted to purchase from New England Robo a new type of automatic carwasher called a "spyder", along with plans and specifications for a building to house it. The equipment and plans were to be supplied by Robo–Wash, Inc., ("Robo"), a company located in Kansas City, Missouri, and related in some way to New England Robo. Robo was to install the equipment in a building constructed by plaintiffs.

Trouble started from the moment the equipment arrived in the spring of 1972. The partners discovered that Robo had supplied the wrong plans, so that the "spyder" would not fit into the building they had provided. In order to install the unit, Robo

employees made several crude and unsatisfactory modifications to the structure. These makeshift changes did not accommodate the unit with complete success, and they subsequently caused numerous problems. When the unit began functioning in April, 1972, other difficulties quickly appeared. The "spyder" broke off car antennas, side mirrors, and chrome; damaged windshields, roof racks, and grills; squirted oil on cars and scratched their finishes; and occasionally sent an unsuspecting auto careening into the sides of the building. Plaintiffs had difficulty getting parts for the temperamental unit, and it frequently was inoperative. Within a month of the opening, Glynn, in a letter to his lawyer, estimated that the partners had already lost over $7500 in repair expenses, lost business and loss of good will.

Understandably upset by the damage that the "spyder" was wreaking on their customers' cars, their reputation in the community. and their hopes of a profitable enterprise, plaintiffs were in constant contact with Robo and New England Robo, asking advice and demanding assistance. The response was half–hearted from the outset, and, within a short time, it disappeared altogether. In April 1973, an exasperated Bartholomew wrote to Robo's president, "Having been in the carwash business for five years, I've seen a lot of various types of equipment, and this Spyder has got to be the most worthless piece of junk that I've ever seen." After detailing the high incidence of breakdowns and damage to customer cars, and the inability to find replacement parts or get prompt servicing, Bartholomew stated, "We are convinced that the Spyder is totally useless and can cause nothing but harm and loss to us to continue to use it under any circumstances." He demanded that Robo remove the unit and replace it with another, reputable brand of equipment; he warned that the partners would sue if not "immediately advised of your intent to make good".

Robo failed to propose a satisfactory solution and, on February 26, 1974, plaintiffs filed suit in this Court.[2] According to Glynn's deposition testimony, the partners had given up on the possibility of Robo's voluntary assistance and took this step to force the company to make good their losses. Their original complaint alleged Robo's repeated representations as to the suitability and fitness of the "spyder" unit and then charged:

The building and the "Spyder Unit" were in fact not suitable, but were unworkmanlike, faultily and poorly designed, manufactured, assembled, and installed, unfacile, and unsoundly built, and were not in accordance with the specifications and intentions agreed upon between the plaintiffs and the defendants.

In consequence thereof, the plaintiffs have been unable to properly function as a "Robo–Wash" licensee and franchisee, in that the "Spyder Unit" frequently is broken down and inoperative, inflicts property damage upon vehicles of customers being washed within the unit, and otherwise has never functioned in accordance with the intended purpose agreed upon between the plaintiffs and the defendants.

The plaintiffs have repeatedly requested the defendants to remedy the aforesaid defects; to remove the said unit; to rescind the agreements between the parties, or otherwise to make fair and equitable compensation to the plaintiffs for their expenditures of time, money and effort and their loss of good will and business reputation, but the defendants have continually and persistently failed and refuse to remedy the said defects and the damages of the plaintiffs.

Plaintiffs sought special damages of $35,-000, for initial investment and ongoing out–of–pocket expenses, and compensatory damages of $250,000, for misrepresentation and breach of contract, expenditure of time and effort, value of services and material, loss of profits, and damage to good will and business reputation.

Three months after suit was filed, Appalachian and Affiliated entered the picture. Both companies issued to Robo a comprehensive insurance policy effective June 1, 1974. Affiliated provided the primary liability coverage, while Appalachian supplied excess liability, or "umbrella", coverage. Both policies expired June 1, 1975. Apparently neither insurer knew of the pending litigation at the time the policies were issued. Prior to June 1, 1974, Robo and/or New England Robo had been insured for various periods by INA, St. Paul and Continental Insurance Company.[3]

In September 1974, the carwash shut down completely. According to the agreed statement of facts, "[T]he decision was made to close down the operation 'when the thing just stopped running'. It was at that point that too many things went wrong all at once, and there was no way to get parts to put it back in operation.... [Bartholomew and Glynn] were getting no support from Robo (i. e., technical help and repair assistance) at the time of the closedown, and it became impossible to locate suppliers of components." The carwash sat idle for seven months; finally, in the spring of 1975, the "spyder" was removed and deposited in a cow pasture.

Meanwhile, discovery and trial preparation were proceeding. In February 1975, Robo's counsel notified Appalachian of plaintiffs' suit and forwarded a copy of the summons and complaint. Appalachian privately determined that, for several reasons, its policy did not provide coverage. In its response to Robo, however, Appalachian asserted only one reason for denying liability: "After a thorough review of the suit papers, it would appear that the matters in controversy *occurred prior to Appalachian's coverage.* It should further be noted that

---

2. *Glynn and Bartholomew v. New England Robo–Wash, Inc., et al.,* C.A. No. 74–0033 (D.R.I. Aug. 4, 1975).

3. INA's policy was in effect from June 1, 1973 to August 1, 1973. St. Paul's policy ran from August 1, 1973 to June 1, 1974. Continental's policy overlapped these periods; it was effective from June 1, 1971 to June 7, 1974.

the suit papers are dated February 27, 1974." (emphasis added).[4] Robo's attorney contested the "no coverage" determination, pointing out that plaintiffs' alleged damages were continuing in nature and would have occurred, at least in part, in the period after June 1, 1974. In the correspondence between Robo and Appalachian, no mention was made of the shutdown in September 1974.[5]

In April 1975, Robo's counsel notified Affiliated of the pending action. Like Appalachian, Affiliated made a private determination that there were several reasons why its policy did not provide coverage. However, it never notified Robo that it was denying coverage. Its response merely stated, "Inasmuch as we are receiving this report of loss quite some time after the accidents occurred, we are conducting our investigation under a full Reservation of Rights." Although Affiliated promised to advise Robo "as to our intentions on defending this matter" as soon as the investigation was completed, Affiliated never again contacted Robo about the case despite Robo's continued inquiries.[6] Once again, it appears that the September 1974 shutdown was not mentioned in the interchange between Robo and its insurer.

Trial of the case began on July 21, 1975. Neither Affiliated nor Appalachian appeared to participate or defend.[7] After seven days of testimony revealed considerable information about the September 1974 closing of the carwash, plaintiffs moved for leave to amend their complaint to conform to the evidence. Leave was granted, and plaintiffs filed an amended complaint whose allegations centered around the shutdown. The pertinent paragraphs asserted:

> [I]n the course of the operation of the car wash facility as a result of continuous and repeated exposure to the conditions intended and inherent in the operation of the car wash facility culminating in September, 1974, defendants breached the express and implied warranties and rewarranties hereinbefore set forth to the extent that said car wash facility, in September, 1974, became wholly inoperable and useless.

> Specifically, defendants breached said warranties in that the "Spyder Unit", building, accessories, supplies, and "extras" were and became wholly inoperable as expressly represented and warrantied and rerepresented and rewarrantied by defendants, were unfit and unsuitable for the purposes intended, were unmerchantable, unworkmanlike, faultily designed, manufactured, assembled, installed, and built by the defendants, all of which as a result of the continued and repeated operations became known to plaintiffs in September, 1974.

> As a result of the misrepresentations and breaches of express and implied warranties and rewarranties of defendants, plaintiffs have, since September 1974, been unable to operate said car wash facility, have been unable to properly function as a Robo Wash Licensee and/or

---

4. The import of the second sentence of this reply is not entirely clear. It may simply have been meant further to emphasize Appalachian's view that the claim fell outside the temporal bounds of the policy. On the other hand, it may have been a veiled charge that Robo had unduly delayed in notifying its insurer of a potential claim. Late notice would then be a second reason for denying coverage.

The parties have devoted considerable argument to whether the insurance companies may now raise grounds for denying coverage that were not presented to Robo back in 1975. Because the Court disposes of this case on a more fundamental issue, it need not decide whether the insurers must limit their "no coverage" defense in the present action to the reasons they gave Robo five years ago.

5. The agreed statement of facts sheds no light on this point, but it seems possible that counsel for Robo was not yet aware that the ailing "spyder" had in fact died.

6. For the reasons given in note 4, *supra*, the Court need not consider plaintiffs' claim that Affiliated's failure to formally deny coverage within a reasonable time estops it from now raising otherwise valid coverage defenses.

7. Of the five insurers who had issued policies to Robo in the 1971–1975 period, only Continental admitted coverage and agreed to defend Robo.

franchisee, in that the "Spyder Unit" is broken down, inoperative and incapable of functioning in accordance with the purposes and intentions agreed upon between plaintiffs and defendants.

Defendants have repeatedly refused to remedy the aforesaid breaches and to make a fair and adequate compensation to plaintiffs.

The list of damages in the amended complaint included property damage, loss of investment, sums expended in repair of customer cars, past loss of profits and future loss of profits–in the total amount of $1,000,000.

Shortly thereafter, plaintiffs reached an acceptable settlement with Robo and New England Robo, and a Consent Judgment in the amount of $300,000 was entered in favor of the partners. Concurrently, both sides entered into an agreement wherein Robo and New England Robo assigned to plaintiffs their rights against their insurance carriers. In return, plaintiffs agreed that if execution of judgment was returned unsatisfied, they would proceed only against the insurance companies. Appalachian and Affiliated were not notified of, nor did they take any part in, the settlement negotiations. They did not receive a copy of the amended complaint.

As both sides expected, the execution was returned unsatisfied. Plaintiffs then instituted the present suit against the four insurance carriers to collect the judgment from one, or several, of them. St. Paul and INA each settled with plaintiffs for $3500 and were dismissed from the action. Plaintiffs have also received $2500 from both Robo and Continental Insurance Co. (which had admitted coverage from the outset). Therefore, plaintiffs now look to Affiliated and Appalachian for the $288,000 balance of their judgment.

## II.

In Rhode Island, the law of the place where the insurance contract was made governs its construction. *See Coderre v. Travelers Insurance Co.*, 48 R.I. 152, 136 A. 305 (1927). Both Affiliated and Appalachi-

an have their home offices in Rhode Island and, although the agreed statement of facts does not address this point, it appears that the insurance contracts were accepted in Rhode Island. Therefore, the case must be decided under the law of Rhode Island.

Affiliated's policy provides in pertinent part:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

.   .   .   .   .

B. property damage to which this insurance applies, caused by an occurrence . . . .

"Property damage" is defined as:

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence* during the policy period.

Similarly, Appalachian's policy states:

The company agrees to pay on behalf of the insured for ultimate net loss in excess of the retained limit hereinafter stated [$10,000], which the insured may sustain by reason of liability imposed upon the insured by law, or assumed by the insured under contract arising out of:

.   .   .   .   .

(b) Property Damage Liability

(1) For damages because of injury to or destruction of tangible property including loss of use resulting therefrom caused by an occurrence;

(2) For damages because of loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence.

The critical term "occurrence" is defined by both policies as:

an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the insured.

Putting aside the question of possible exclusions from coverage,[8] the parties agree that the disastrous consequences of the sale and operation of the "spyder" unit fall within the definition of "occurrence", and that the damages plaintiffs suffered are prima facie compensable under a liability policy with the above terms. The issue that is vigorously disputed is whether the "occurrence" happened at a time when Affiliated and Appalachian were the insurers on the risk. The chronology of the relevant events is represented by the following graph:

Before trying to pinpoint one segment of this four–year period as the "occurrence", it must be asked whether the "spyder" incident gave rise to multiple "occurrences", each representing a portion of plaintiffs' total damages. To determine whether more than one occurrence took place, the majority of jurisdictions employs the "cause theory". See Annotation, 55 A.L.R.2d 1300 (1957); Olsen v. Moore, 56 Wis.2d 340, 202 N.W.2d 236 (1972). Using this analysis, the court asks if "[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." Truck Insurance Exchange v. Rohde, 49 Wash.2d 465, 471, 303 P.2d 659, 662 (1956). If so, there has been but one occurrence, even though several discrete items of damage resulted.

See, e. g., St. Paul Mercury Indemnity Co. v. Rutland, 225 F.2d 689 (5th Cir. 1966) (truck colliding with train, damaging 16 cars belonging to 14 owners, is one occurrence); Southern International Corp. v. Poly–Urethane Industries, Inc., 353 So.2d 646 (Fla.App.1977) (application of polyurethane to several roofs pursuant to one contract is one occurrence); Allied Grand Doll Mfg. Co. v. Globe Indemnity Co., 225 N.Y. S.2d 595, 15 A.D.2d 901 (App.Div.1962) (per curiam) (damage to several offices from faucet running over weekend is one occurrence).

Although most of these cases involve one temporal incident in which several different persons or pieces of property were affected, the analysis seems equally applicable to a case where one item of property undergoes

8. Both Affiliated and Appalachian contend that, even if the occurrence did happen within their policy periods, some or all of plaintiffs' damages are excluded from coverage by various special policy provisions. The Court need not reach the merits of these contentions.

252

several transformations over a period of time. The damage plaintiffs incurred when they were forced to shut down their entire operation may have been different in magnitude than the harm they suffered from the "spyder's" faulty and intermittent operation. Yet, the source of all their injury was a single event: the sale of a defectively designed and constructed carwash unit. According to the "cause theory", then, this unitary, uninterrupted cause produced but one occurrence for insurance purposes. The Court has not been directed to any Rhode Island case on this point, but it believes that Rhode Island would follow the majority view. Even were the state to elect the minority position, the Court's conclusion would be the same. The alternative method, the "effect theory", analyzes the incident from the point of view of the person whose property was injured. *See, e. g., Lombard v. Sewerage and Water Board of New Orleans*, 284 So.2d 905, 915–16 (La. 1973). From plaintiffs' perspective, it cannot be said that the breakdown of the "spyder" was distinct from the months of aggravation and difficulty that had come before. The agreed statement of facts and exhibits establishes without doubt that the "spyder's" condition, which had never been very good, progressively degenerated until September 1974, "when the thing just stopped running." Thus, even under the "effect theory" there would be but a single occurrence. *But see Gruol Construction Co., Inc. v. INA*, 11 Wash.App. 632, 524 P.2d 427 (1974) (court finds latent, progressive worsening of dry rot to be a continuing occurrence, and imposes joint liability on all insurers providing coverage at any point from inception to discovery).

There are three logical points at which this occurrence could be placed. The sale and supplying of the defective unit could be selected, on the theory that this wrongful act was the cause of all plaintiffs' damage and the source of Robo's liability. Alternatively, the September, 1974, shutdown could be chosen, for it was the point at which the

uselessness of the equipment was conclusively established. The third possibility is some less definite, intermediate time when the discovery of the "spyder's" irremediable flaws was, or reasonably should have been, made. This alternative would allow for an interval of attempted adjustment and "debugging", yet would fix the moment of damage earlier than the bitter end, at the point where the partners should realistically have recognized that the "spyder" could not fulfill its warranted purpose.

To the Court's knowledge, there are no Rhode Island cases directing the selection of one of these points as the proper definition of "occurrence". The first alternative, the commission of the wrongful act, has been rejected by the vast majority of jurisdictions. *See* Annotation, 57 A.L.R.2d 1385 (1958). The parties agree that the general rule is accurately stated: "The time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged." *United States Fidelity & Guaranty Co. v. American Insurance Co.*, 345 N.E.2d 267, 270 (Ind.App.1976). *See Travelers Insurance Co. v. C. J. Gayfers & Co.*, 366 So.2d 1199, 1202 (Fla.App.1979); *Singsaas v. Diederich*, 307 Minn. 153, 238 N.W.2d 878, 880 (1976); *Peerless v. Clough*, 105 N.H. 76, 193 A.2d 444, 446 (1963); *Deodato v. Hartford Insurance Co.*, 143 N.J.Super. 396, 363 A.2d 361, 365 (1976). *But see Tijsseling v. General Accident Fire & Life Assurance Corp., Ltd.*, 55 Cal.App.3d 623, 127 Cal.Rptr. 681 (1976) (quoting general rule but finding that occurrence happened at time misrepresentation was made, not at time of discovery).[9]

Unfortunately, conceding the applicability of the "time of actual damage" standard does not bring this case much closer to solution. When does damage actually occur, as a matter of law, in a situation where damage was actually occurring, as a matter of fact, for a period of three years?

9. The minority rule, that the "occurrence" is the wrongful act giving rise to liability, is exemplified by *Audubon Coin & Stamp Co. v. Alford Safe & Lock Co.*, 230 So.2d 278 (La.App.1969) (installation of defective safe, rather than theft of valuables, is time of accident).

Many of the cases discussed by the parties in their briefs involve the commission of a wrongful act which produces no discernible harm for a period of time and then, suddenly, manifests itself in a burst of damage. *See, e. g., Remmer v. Glen Falls Indemnity Co.,* 140 Cal.App.2d 84, 295 P.2d 19 (1956) (rock mass, placed several years earlier during grading, came loose and slipped onto victim's property); *Travelers Insurance Co. v. C. J. Gayfers & Co.,* 366 So.2d 1199, 1202 (Fla.App.1979) (faulty roof drainage system finally leaks); *Prieto v. Reserve Insurance Co.,* 340 So.2d 1282 (Fla.App. 1977) (negligently constructed roof collapses); *Singsaas v. Deiderich,* 307 Minn. 153, 238 N.W.2d 878 (1976) (collapse of negligently installed manlift); *Peerless v. Clough,* 105 N.H. 76, 193 A.2d 444, 446 (1963) (fire in negligently built chimney); *Deodato v. Hartford Insurance Co.,* 143 N.J. Super. 391, 363 A.2d 361 (1976) (poorly built roof blows off). Such cases provide little guidance in a situation where damage was evident from the outset and intensified as time progressed.

The two cases that present factual circumstances most similar to those of this case support the selection of the "discovery point" as the time of the occurrence. In *Hogan v. Midland National Insurance Co.,* 3 Cal.2d 553, 91 Cal.Rptr. 153, 476 P.2d 825 (1970), the insured saw manufacturer sold a defective saw to complainant lumber mill. From the time of installation, the saw failed to work properly. Over the course of several months, the lumber mill continued to run the saw while attempting, with the manufacturer's help, to get the "bugs" out of it. In the natural course of the mill's sales, its customers began to receive lumber cut on the new saw. Many customers rejected this wood as undersized and the mill, now recognizing the seriousness of the problem, began deliberately to cut the lumber oversized to compensate. Finally, the mill sued the manufacturer and received a judgment including damages for the com-

pensatory overcutting. It then sued the manufacturer's insurance company to recover the judgment. The California Supreme Court rejected the insurer's argument that there was no "accident" within the meaning of the policy because the lumber mill had known from the outset that the saw did not work properly. In allowing recovery for the first several months of operation, the court pointed out that the saw had worked intermittently during the period when the mill and the manufacturer were trying to remedy the flaws in the equipment. The critical point, in the court's view, was the time that customers began rejecting the lumber. In denying recovery for damages incurred after that point, the court said:

> Not until April, 1962, more than seven months after the initial use, did Kaufman become aware the lumber cut by the saw was sufficiently defective to cause a customer to reject an order. Immediately thereafter, he commenced to cut all lumber overwide to avoid customer complaint. It thus appears that the narrow boards had been processed by the time Kaufman was aware that the defects in the saw were sufficiently serious to affect his clientele.

91 Cal.Rptr. at 156, 476 P.2d at 828.

The timing of the "occurrence" was the precise question before the Indiana Court of Appeals in *United States Fidelity and Guaranty Co. v. American Insurance Co.,* 345 N.E.2d 267 (1976). A house had been built with defective bricks, whose unstable surface gradually flaked off. This flaking, or "spalling", occurred over the course of several years and three different insurance coverage periods. After citing the general rule that the occurrence happens at the time of actual damage, the court discussed the meaning of "property damage". Since the policy at issue excluded injury to the actual product supplied by the insured [10]—i. e., the bricks—the court rejected the suggestion that the spalling *per se* was the relevant damage. Rather, it viewed the com-

---

**10.** This is apparently a common provision of products liability insurance. Affiliated's policy excludes "property damage to the named insured's products arising out of such products

or any part of such products." (exclusion "n"). Similarly, Appalachian's policy does not cover injury to or destruction of "any goods or products ... manufactured, sold, handled, or dis-

pensable property damage as the harm *to the entire structure* evidenced by the spalling. The court then concluded that the insurer whose policy was in effect during the period when spalling sufficient to put the reasonable person on notice of a possibly defective structure *first* occurred must bear the entire loss.

While neither of these cases involved a situation where, as here, a long period of cumulating property damage culminated in an absolute loss of use, this Court finds their reasoning applicable and persuasive. Particularly in the case of a complex piece of equipment such as an automatic car wash facility, it is to be expected that a period of repair and adjustment will be necessary. As the California Supreme Court in *Hogan* wisely recognized, the supplier and the customer ought to have some leeway in attempting to work out problems without fear that failure to make an immediate claim will preclude insurance coverage. Therefore, the fact that a product's malfunction causes some perceptible damage from the moment of installation should not, standing alone, trigger the finding of an "occurrence". At the same time, it is sheer wastefulness to encourage the expenditure of time, money, and effort on equipment that is an irredeemable piece of junk. Once it becomes apparent that a product is fundamentally flawed, such that it is incapable of fulfilling its intended purpose, then the "property damage neither expected nor intended from the standpoint of the insured"–i. e., the "occurrence"–has happened.

In this case, the Court finds that the plaintiffs knew, or reasonably should have known, that the "spyder" was fundamentally flawed and incapable of fulfilling its intended purpose prior to the inception of Affiliated and Appalachian's policies on June 1, 1974. According to Bartholomew's deposition testimony, he first expressed an opinion as to the unit's uselessness in summer, 1972. In May, 1973, he wrote to Robo's president demanding replacement equipment on the grounds that the "spyder" was "the most worthless piece of junk" that he'd ever seen. Other relevant sections of that letter read:

We understand that the inventor of the Spyder has left Robo's employ. We understand that Spyder units are no longer being manufactured and several Robo people have admitted to us that the entire unit is a complete flop and has been written off as a "bad dream" by Robo. After an initial investment of 70 thousand dollars for our carwash (exclusive of land), we have suffered a net operating loss of 24 thousand dollars for our first year's operation. This unit has been a constant source of total aggravation and has created untold bad will among the carwashing public for our carwash location for many years to come.

We figure that we are out about 100 thousand dollars less salvage (scrap value) which we understand is very little. Although the warranty has expired on this unit, if you consult with your legal counsel, you will find that there is such a thing as an implied warranty.

We calculate that the total amount of money that we are out is equivalent to a complete Hanna tunnel brush, conveyorized wash and dry unit. We are convinced that the Spyder is totally useless and can cause nothing but harm and loss to us to continue to use it under any circumstances. Accordingly, we will not be satisfied by anything short of removal of the Spyder unit by you and replacement with a unit equivalent to the Hanna tunnel brush, conveyorized wash and dry unit, and building modifications at your total expense.

The Court recognizes that a certain amount of this language may be discounted as exaggeration born of the partners' understandable outrage. Nevertheless, circumstances bear out the reasonableness of concluding, long before the carwash shut down in September 1974, that the unit was hopelessly defective. According to Bartholomew's letter, parts were breaking down that could not be replaced. This problem

---

tributed by the named insured, or by others trading under his name, or premises alienated by the name insured, arising out of such goods or products or premises or any part of such goods, products or premises." (exclusion (b)(2)).

was reiterated in the partners' answers to Robo's interrogatories, given May 20, 1974. (Ans. 1). A machine for which certain parts are unavailable must inevitably become inoperative. In these same interrogatories, the partners state that the "spyder" simply was not capable of the "fully automatic operation with a minimum of maintenance" that it was intended to provide. (Ans. 3(b)). They also stated that they expected to prove between 50 and 100 days of total or partial breakdown in their first two years of operation. (Ans. 5). They summarized: "Permanent resolutions to the operating problems have never come to pass. Service and parts have been unavailable. Technical assistance has been withheld." (Ans. 9(a)). All these things indicate that a realistic appraisal of the "spyder" would have revealed the unit's terminal illness long before its actual death.

The best evidence that the partners realized the extent of their problems was their decision to file suit against Robo in February 1974. The parties have become deeply enmeshed in arguments over the meaning of the 1975 consent judgment against Robo and the status of the original complaint in that action *vis-a-vis* the amended complaint. This has largely been due to plaintiffs' insistence that the entry of judgment on their amended complaint (the allegations of which center around the shutdown) established the time of the occurrence as September, 1974, as a matter of law. With respect, the Court believes that the parties have misconceived the issues. It is true, as plaintiffs assert, that the prior action conclusively established Robo's liability for the breach of warranty that led to the 1974 closing.[11] However, as both sides recognize, the prior action did not purport to adjudicate the timing of the occurrence for insurance purposes. The facts that Robo breached certain warranties, that the carwash closed in 1974, and that there was a causal connection between the breach and the shutdown are certainly relevant to the present case; however, the existence and extent of Robo's liability for supplying a defective product do not automatically determine the existence and extent of Robo's insurance coverage. *See Hogan v. Midland National Insurance Co.*, 3 Cal.2d 553, 91 Cal.Rptr. 153, 476 P.2d 825 (1976).

Without commenting on the merits of either side's characterization of the original complaint after amendment had been permitted, this Court considers plaintiffs' institution of suit against Robo in February, 1974, to be convincing evidence of the partners' knowledge of the "spyder's" unmitigated uselessness.[12] The nature of the allegations made and the damages sought at that time have been set out in Part I and will not be repeated here. A review of the original complaint makes one thing very clear. While the amended complaint filed after the shutdown emphasizes different facts as evidence of Robo's wrongdoing, the essential claim is the same as in February, 1974—*plaintiffs, to their great detriment, were induced to buy a product unfit, in design and manufacture, for what it was held out to accomplish.*

Plaintiffs contend that, if the Court does not agree that the judgment against Robo

---

11. An insurer who was notified of a pending action and refused to defend is bound by issues actually or necessarily litigated in the first trial, even though the insurer may have reasonably believed that its policy did not cover the claim. *See Geddes & Smith, Inc. v. St. Paul–Mercury Indemnity Co.*, 51 Cal.2d 558, 561–62, 334 P.2d 881, 883 (1959); *Grenga v. National Surety Corp.*, 113 R.I. 45, 49, 317 A.2d 433, 436 (1974); *Angelone v. Union Mutual Insurance Co.*, 113 R.I. 230, 231–32, 319 A.2d 344, 346 (1974); Annotation, 27 A.L.R.3d 350 (1969). In other words, the insurer takes the risk that no facts will come to light in the course of the litigation that contradict its initial "no coverage" decision.

Thus, in the absence of fraud or collusion—neither of which is alleged here—Affiliated and Appalachian are bound by the determination of Robo's liability in the prior action.

12. The Court wishes to make clear that it is not holding that the filing of an action for breach of warranty conclusively fixes the time of the occurrence for insurance purposes. The complicated fact patterns in cases of this sort render impossible a universal affirmative solution. Here, in the totality of circumstances, the Court finds that the filing of the suit in February, 1974, represents the latest possible date on which the occurrence could have happened. Conceivably, in another case the date of filing a complaint may not be controlling.

established the occurrence as the September, 1974 closing, then summary judgment is inappropriate. The Court disagrees. Because Affiliated and Appalachian are the only insurers left in the case, the sole question for decision is whether the occurrence took place outside the temporal limits of their policies. The precise date of discovery is not important so long as it occurred prior to June 1, 1974. Bartholomew's 1973 letter to Robo, his deposition testimony, the answers to interrogatories, and the complaints from the prior action are all part of the facts stipulated by the parties. In the Court's view, these are sufficient to place the occurrence some time before June 1, 1974.

The Court is extremely sympathetic to the plaintiffs' position and recognizes that its decision today may mean that they recoup very little of their losses in the whole sad "spyder" incident. Nevertheless, it is convinced that, for the reasons given above, defendants' motion for summary judgment must be granted, and plaintiffs' motion denied.

It is so ordered.