**STING SECURITY, INC., et al.**

v.

**FIRST MERCURY SYNDICATE, INC.**

Civ. No. JFM–91–1140.

United States District Court,
D. Maryland.

Jan. 14, 1992.

Kenneth R. West, Levitan, Ezrin, West & Kerxton, Bethesda, Md., for plaintiff.

Morris Kletzkin, Washington, D.C., for defendant.

## MEMORANDUM

MOTZ, District Judge.

Sting Security, Inc. ("Sting"), Patrol Command Systems, a division of Sting and Robert D. Arscott, Jr., president of Sting (collectively "Sting") have brought this action seeking a declaration that their insurer, First Mercury Syndicate, Inc. ("First Mercury"), has a duty both to defend and indemnify them in connection with a lawsuit currently pending in the Circuit Court for Prince George's County. First Mercury has filed a counterclaim for a declaratory judgment that it is under neither duty. The parties have filed cross-motions for summary judgment.

### I.

#### A.

Sting, a Maryland corporation, is engaged in various aspects of the security business. Apparently, Sting's original business was providing alarm monitoring services to commercial customers. Since 1988 at the latest, Sting has also marketed a product known as "Patrol Command" to other security firms. Patrol Command is a computer system consisting of both hardware and software that purportedly allows security agencies to schedule guard assignments with greater efficiency.

From 1988 to 1990, First Mercury, a Michigan insurer, insured Sting under two standard-form comprehensive general liability ("CGL") policies. The first policy covered the period December 20, 1988 to December 20, 1989. The policy was renewed in 1989 and covered the period November 1, 1989 to November 1, 1990. The second policy continued the terms and provisions of the first. Consistent with Sting's business at that time, the policies

described the operations for which Sting was insured as "Detective or Patrol Agencies. Including Completed Operations. Including Alarm Monitoring." The policies further stated that "Products" were not covered.[1]

Under the CGL provisions, First Mercury agreed to indemnify Sting for "all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury ... or ... property damage to which this insurance applies, caused by an *occurrence.*" (Emphasis added). Additionally, First Mercury assumed the "right and duty to defend any suit against [Sting] seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent." The policies contain the following relevant definitions:

"occurrence" means an accident, including continuous or repeated exposure to conditions, *which results in bodily injury or property damage* neither expected nor intended from the standpoint of the insured;

\* \* \* \* \* \*

"property damage" means (1) physical injury to or destruction of tangible property *which occurs during the policy period,* including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed *provided such loss of use is caused by an occurrence during the policy period.*

(Emphasis added). As is typical of CGL policies, the basic declaration of coverage was subject to numerous exclusions and limitations.

During 1990, First Mercury and Sting amended the second policy, apparently in order to reflect Sting's new line of business, the sale of Patrol Command. Pursuant to Endorsement 8, the parties added "Patrol Command Systems, A Division of Sting Security, Inc." as a named insured and "Manufacturing & Sales of Patrol Command Systems Software" to the description of insured operations. The endorsement also stated that "[a]ll other terms and conditions remain unchanged." Endorsement 9 amended the policy to provide coverage for "products." By their express terms, both endorsements became effective on July 30, 1990.

### B.

On September 7, 1990, Security Administration Services, Inc. ("Security") filed a civil complaint against Sting, Patrol Command Systems and Arscott in the Circuit Court for Baltimore City. In December 1990, Security obtained a dismissal of the suit and refiled the identical complaint in the Circuit Court for Prince George's County. According to the complaint, from August, 1988 through April, 1989, Sting, doing business as Patrol Command Systems, attempted to sell Patrol Command to Security. On April 17, 1989, Security purchased Patrol Command hardware and was licensed as an "end user" of the component software.

The general thrust of the Security complaint is that in the course of sales negotiations, Sting and Arscott misrepresented the capabilities of Patrol Command as a management system for security services and that Security relied on these misrepresentations to its detriment. Specifically, Security alleges that Sting and Arscott misrepresented that Patrol Command "would permit [Security] to schedule, monitor, create time cards for, and a permanent record of, the activities of its watchmen." As described by Sting, Patrol Command would gather the information necessary to perform these functions by means of bar-code readers installed at sites monitored by Security which would read bar-code badges carried by Security's watchmen; the data would then be transmitted by telephone modem to a central computer for processing. Security also alleges that Arscott personally assured Security that Patrol Command was a "tried and tested computer hardware and software package" used by

---

**1.** In addition to basic CGL insurance, the policies provided insurance for personal injury liability and contractual liability. This dispute, however, only concerns First Mercury's obligations under the CGL portion of the policies.

Sting in its own business, that the bar-code readers and communications equipment would function outdoors and that Sting would replace any malfunctioning equipment within 24 hours.

According to Security's complaint, Patrol Command "never substantially performed the functions described" by Sting. Allegedly, Patrol Command's crucial defect was the failure of the on-site communications equipment to function in cold weather. Contrary to Arscott's assurances, Sting allegedly let the defective components go for weeks without repair or replacement. Security also alleges that Arscott's statements concerning Sting's extensive experience with Patrol Command were false and that Security was the victim of bait-and-switch tactics: the system delivered to Security was, in fact, a wholly different system from that which Arscott had demonstrated to Security at Sting's offices.

Security alleges that as a consequence of Sting's misrepresentations and Patrol Command's defects, it suffered extensive injuries. The complaint asserts claims of fraud, negligent misrepresentation and breach of warranty against Sting and Arscott. Security seeks $300,00 in compensation for (1) the difference in value between the system promised and the negative value of Patrol Command; (2) lost profits; (3) damage to Security's business reputation; (4) additional personnel costs; and (5) costs associated with thefts directly attributable to the failure of Patrol Command. Security also requests punitive damages in the amount of $1,000,000.

Shortly after Security filed its complaint, Sting and Arscott put First Mercury on notice of the suit. First Mercury denied coverage based on the allegations in the underlying complaint. Consequently, Sting filed the present action in the Circuit Court for Prince George's County. First Mercury timely removed the action to this court.

## II.

The first issue presented is that of the choice of law. Maryland law governs the selection of the applicable law in this diversity action. *E.g., Klaxon v. Stentor Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Maryland conflicts rules, an insurance contract is construed "according to the laws of the state where the last act is performed which makes [the] agreement a binding contract." *Travelers Indem. Co. v. Allied–Signal, Inc.,* 718 F.Supp. 1252, 1253 (D.Md.1989); *Grain Dealers Mut. Ins. Co. v. Van Buskirk,* 215 A.2d 467, 241 Md. 58 (1965). Typically, this is where the policy is delivered and the premiums are paid. *E.g., Aetna Cas. & Sur. Co. v. Souras,* 78 Md.App. 71, 552 A.2d 908, 911 (1989). While it is not clear where Sting paid its premiums, both policies were issued to Sting at its address in Arlington, Virginia. Additionally, the policies contain provisions specifically relevant to Virginia insurance regulation. Therefore, it appears that the law of Virginia governs this dispute.[2]

Under Virginia law, an insurer's "obligation to defend arises whenever the complaint against the insured alleges facts and circumstances, some of which, if proved, would fall within the risk covered by the policy." *Brenner v. Lawyers Title Ins. Corp.,* 240 Va. 185, 189, 397 S.E.2d 100, 102 (1990). However, the insurer has no duty to defend if the allegations preclude the possibility of a judgment for which the insurer would be liable under the policy.

Here, First Mercury advances three arguments why the policies which it issued to Sting would not provide coverage for any judgment obtained by Security against Sting: (1) there was no "occurrence" within the relevant policy periods; (2) none of the damages which Security claims in its suit constitute "property damage" as defined by the First Mercury policy; and (3) Security's allegations do not describe an "accident, neither expected nor intended from the standpoint of [Sting]." The first two

2. Although the choice of law issue must be addressed, it is somewhat academic since the parties have not suggested any material differences between Virginia and Maryland law on the issues presented.

of these arguments are meritorious; I therefore need not consider the third.[3]

## A. *The "Occurrence" Issue*

■ All of Security's claims against Sting are predicated on the sale of Patrol Command. The parties agree that "products" were not among the hazards insured until Endorsements 8 and 9 became effective on July 30, 1990. Thus, as a "product," Patrol Command was not covered until that date. Sting contends, however, that Patrol Command was also covered as a "completed operation" once Security had purchased the software system on April 17, 1989. Sting thus argues for overlapping periods of coverage with respect to Patrol Command: (1) from April 17, 1989 to November 1, 1990 under the "completed operations hazard;" and (2) from July 30, 1990 to November 1, 1990 under the "products hazard."

Sting's position depends upon construction of Endorsement 8. Prior to Endorsement 8, the policies made no mention of Patrol Command. Endorsement 8 effected two amendments to the second policy: (1) "Patrol Command Systems, A Division of Sting Security, Inc." was added as a named insured; and (2) "Manufacturing & Sales of Patrol Command Systems Software" was added to the description of operations insured, which had previously read: "Detective or Patrol Agencies including Completed Operations including Alarm Monitoring." Consistent with these changes, Endorsement 9 added "products" as an insured hazard. Thus, only if "Detective or Patrol Agencies ... including Alarm Monitoring" originally included "Sale & Manufacturing of Patrol Command Systems Software" did Sting enjoy coverage before July 30, 1990 with respect to the facts alleged by Security.

Sting's interpretation contradicts the plain meaning of the policy language. Common English usage does not support the conclusion that the original description of operations was coextensive with the latter. The original description refers to the sale of certain services, the latter to the sale of a product for use in such services and perhaps, additional services incidental to the sale. Sting's reading also makes little sense from the standpoint of the parties' intent. If Sting was already covered with respect to Patrol Command before July 30, 1990, Endorsements 8 and 9 would have served no purpose. On the contrary, the patent intent behind Endorsements 8 and 9 was to provide coverage for a new venture, the manufacture and sale of Patrol Command, where none had existed before.[4] Thus, unless there was an "occurrence" on or after July 30, 1990, no coverage exists with respect to the Security complaint.

■ Determining whether there was an "occurrence" on or after July 30, 1990 raises a preliminary question: whether the events surrounding the sale of Patrol Command, as alleged, constitute one or multiple "occurrences." *See Bartholomew v. Insurance Co.*, 502 F.Supp. 246, 251 (D.R.I. 1981), *aff'd*, 655 F.2d 27 (1st Cir.1981). If the allegations indicate only a single "occurrence," it must have occurred after the endorsements became effective in order to place First Mercury under a duty to defend Sting. If, on the other hand, there were multiple "occurrences," the existence of any single "occurrence" on or after July 30, 1990 would entitle Sting to a legal defense.

The general rule is that the number of "occurrences" is determined by the cause or causes of the alleged injury rather than the number of claims arising from such injury. Barry Ostrager & Thomas New-

---

**3.** My decision applies equally to Arscott. Arscott's claim to coverage rests on the fact that under the policy, "any executive officer" of a corporate named insured is also an insured provided that liability arises from an act within the scope of the officer's duties. Although Arscott undoubtedly made the alleged misrepresentations within the scope of his duties as president

of Sting, his coverage can extend no further than Sting's.

**4.** Sting does not (and could not) argue that Endorsements 8 and 9 merely clarify and confirm coverage that already existed. The effective date of the endorsements was July 30, 1990; they do not relate back to the commencement of the policy period.

man, *Insurance Coverage Disputes* § 7.04 at 163 (1988) (citing *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir.1982)); *see also Michigan Chem. Corp. v. American Home Ass. Co.*, 728 F.2d 374, 378 (6th Cir.1984); *but see American Home A. Co. v. Dykema, Gosset, Spencer, Goodnow & Trigg*, 811 F.2d 1077, 1084 (7th Cir.1987) ("cause" test should apply only to construe policy limits, not whether injury is covered.)[5] Under the cause-oriented analysis, the court asks if " '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.' " *Appalachian*, 676 F.2d at 61 (quoting *Bartholomew*, 502 F.Supp. 246 at 251). This approach reflects the policy language: an "occurrence" includes "repeated or continuous exposure to conditions" which results in injury to person or property during the policy period.

In the context of products liability litigation, courts have consistently held that multiple claims resulting from the manufacture or distribution of a defective product constitute a single "occurrence." *See Champion Int'l Corp. v. Continental Cas. Co.*, 546 F.2d 502, 505–06 (2d Cir.1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977) (defective vinyl siding installed in vehicles); *Household Mfg. Inc. v. Liberty Mut. Ins. Co.*, No. 85 C 8519, 1987 WL 6611, 1987 U.S.Dist. LEXIS 1008 (N.D.Ill. Feb. 10, 1987), *modified*, No. 85 C. 8519, 1987 WL 20137 (N.D.Ill. Nov. 16, 1987) (residential plumbing system); *Bartholomew*, 502 F.Supp. at 252 (automated carwash machinery); *Cargill, Inc. v. Liber-*

*ty Mut. Ins. Co.*, 488 F.Supp. 49, 53 (D.Minn.1979), *aff'd*, 621 F.2d 275 (8th Cir. 1980) (nutrient medium used in manufacture of antibiotics). Where courts have found that distribution of a defective product yielded several "occurrences," the determinative factor was the number of causal events, not the number of claims or claimants. *See Michigan Chem. Corp.*, 728 F.2d at 382–83 (holding that each shipment of defective feed supplement from manufacturer to distributor was an "occurrence"); *but see Household Mfg.* (finding single "occurrence" despite sale of defective product on "repeated and continuous basis").

Although Security allegedly suffered discrete injuries at different times as a result of defects in Patrol Command, all the injuries alleged stem from "one proximate, uninterrupted and continuing cause:" the sale of a defective security management system to a single customer. *Bartholomew*, 502 F.Supp. at 251, 252. Similarly, Security's legal claims, whether for misrepresentation or breach of warranty, are all predicated on the sale of Patrol Command. Under the majority rule, then, the Security complaint describes only one "occurrence." *Id.*[6] Thus, coverage depends on whether this "occurrence," based on the facts alleged in the complaint, can be placed on or after July 30, 1990.

■ Unlike the number of "occurrences," the timing of an "occurrence" depends not on its cause but its effects: "[D]etermination of when an occurrence happens must be made by reference to when the

---

**5.** A minority of courts still employ an older effects-oriented rule, which usually results in a greater number of "occurrences." *See* Ostrager & Newman, *supra*, at 164. It appears, however, that Virginia would follow the majority rule. *See, e.g., American Cas. Co. v. Heary*, 432 F.Supp. 995, 997 (E.D.Va.1977) ("[C]overage must be tied to [the insured's negligent act] rather than to the results which flow therefrom.") (construing coverage limits per "occurrence" under automobile liability policy).

**6.** *Bartholomew* is almost indistinguishable from this case. It involved products liability claims against the manufacturer of an automated carwash system. Specifically, the carwash unit damaged cars, stripping them of antennas, mir-

rors and chrome, rather than washing them. Ultimately, the machine shut down completely. The underlying complaint was largely the same as the Security complaint. Plaintiffs, operators of a carwash who had purchased the carwasher, alleged misrepresentation and breach of express and implied warranties and sought recovery for repairs to damaged cars, loss of investment, lost profits and damage to business reputation. 502 F.Supp. at 247–48. The court reasoned that although plaintiffs suffered distinct types of injury over a period of time, the source of all their injury was a single event: the sale of a defectively designed and constructed carwash unit. Thus, there was but one "occurrence" for insurance purposes. *Id.* at 252.

injurious effects of the occurrence took place." *Appalachian*, 676 F.2d at 61–62. In a case like this, where the substance of the complaint concerns economic damage arising from a contractual relationship, "the occurrence takes place when the injuries first manifest themselves." *Appalachian*, 676 F.2d at 62 (employment discrimination) (citing *Bartholomew*, 502 F.Supp. at 254). A "manifestation" rule is especially appropriate here since Security essentially seeks compensation for its defeated expectations. In other words, Security's injuries were due to the failure of Patrol Command to perform as Security, relying on Sting's representations, thought it would. Accordingly, Security allegedly suffered injury when it became "apparent that [Patrol Command] was fundamentally flawed, such that it [was] incapable of fulfilling its intended purpose." *Bartholomew*, 502 F.Supp. at 254.

The facts alleged by Security indicate that fundamental flaws in Patrol Command were evident well before the effective date of Endorsements 8 and 9. Security purchased the system in April, 1989. According to the complaint, Patrol Command *"never* substantially performed" as Sting had represented it would. (Emphasis added). The bar-code readers and the "communication boxes" used to store them did not work "out of doors in winter weather." Sting failed to replace the defective components even though replacement "was essential for the operation of Patrol Command" as a system for managing the assignment of security guards. Since Security filed its complaint in September, 1990, one must infer from the allegations that Security discovered defects in Patrol Command no later than the winter months, 1989–90. Consequently, the "occurrence" happened before July 30, 1990.

Sting contends, however, that since Security continued to suffer injuries due to defects in Patrol Command at least until the filing of the complaint in September, 1990 there was an "occurrence" after Endorsements 8 and 9 became effective. This argument is meritless. As a matter of law, the date of an "occurrence" is when the defects in the product become evident.

*E.g., Bartholomew*, 655 F.2d at 28–29. Thus, the insurer, if any, on that date must alone provide coverage even if the resultant injuries continue throughout successive policy periods. *See Appalachian*, 676 F.2d at 63; *Bartholomew*, 502 F.Supp. at 255. Here, Sting's coverage with respect to Patrol Command had not yet commenced at the time of the "occurrence." Thus, the fact that Security's injuries, though caused by an "occurrence" prior to the policy period, persisted into the policy period cannot establish coverage.

### B. *The "Property Damage" Issue*

██ Even if there were injury within a relevant policy period, there would still be no "coverage under the policies" because the Security complaint does not allege "property damage" within the meaning of the policy language.

The policies define "property damage" as:

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Under either of these definitions "property damage" must have some causal connection to "tangible property." Security alleges only two types of damage which even arguably reflect a loss of "tangible property:" the difference in value between the system promised and the negative value of Patrol Command; and costs associated with thefts from Security's customers attributable to the failure of Patrol Command. Both items are excluded from coverage, however. Exclusion (n) excludes coverage for damage to the insured's product and exclusion (o) excludes coverage for damage to the insured's work. Additionally, exclusion (p) precludes coverage for damages attributable to repair or replacement of the insured's product. Thus, to the extent Security seeks recovery for damage to Patrol Command itself, Sting is not insured. While damages for thefts from

customers are not subject to any of these exclusions, a special limitation endorsement attached to the policy expressly precludes insurance for damages arising out of theft or the mysterious disappearance of goods. Thus, damages to compensate for goods stolen from Security's customers clearly fall outside the risk insured by First Mercury.

■ The remaining damages alleged by Security represent intangible economic losses resulting from the failure of Patrol Command to perform as Security expected: lost profits; additional personnel costs; diminished capacity to generate new business; and damage to Security's business reputation. Such consequential damages are not "damages on account of property damage," as that term is defined by the policy. The majority of courts construing the first prong of the definition have held that lost profits and other consequential damages constitute "property damage" only where "there has been a direct physical injury to tangible property, followed by the consequential damages." *Aetna Cas. & Sur. Co. v. First Security Bank,* 662 F.Supp. 1126, 1129 (D.Mont.1987) (lost wages due to wrongful termination not "property damage"); *see also Lassen Canyon Nursery v. Royal Ins. Co.,* 720 F.2d 1016, 1018 (9th Cir.1983) (intangible economic loss must reflect "a measure of damage to tangible property"); *Aetna Cas. & Sur. Co. v. General Time Corp.,* 704 F.2d 80, 83 (2d Cir.1983). The economic losses alleged must result from physical injury to tangible property other than the insured's product or work. *Ohio Cas. Ins. Co. v. Bazzi Constr. Co., Inc.,* 815 F.2d 1146, 1148 (7th Cir.1987) (construing CGL definition under Illinois law); *Aetna Cas. & Sur. Co. v. McIbs, Inc.,* 684 F.Supp. 246, 248 (D.Nev.1988), *aff'd,* 878 F.2d 385 (9th Cir. 1989). Here, the Security complaint contains no allegation of physical injury to tangible property owned by it or anyone else that does not otherwise fall within the policy's exclusionary provisions. Thus, Security's consequential damages do not qualify as "property damage" under the first prong of the definition.

Although it has not expressly done so, Sting might argue that Security's economic losses satisfy the second prong of the "property damage" definition: "loss of use of tangible property which has not been physically injured or destroyed." Because of defects in Patrol Command, the argument would go, Security was unable to employ its resources, including physical assets such as vehicles and security equipment, with the efficiency demanded by the marketplace. Consequentially, Security lost customers and profits. Therefore, the economic damages alleged by Security represent the "loss of use of tangible property" not otherwise injured.

Such an argument would be extremely weak. The complaint points to no physical asset, the productive capacity of which has been impaired; any loss in efficiency was due merely to the fact that Patrol Command was not what Security had bargained for. *Compare American Motorists Ins. Co. v. Trane Co.,* 544 F.Supp. 669, 687 (W.D.Wis.1982), *aff'd,* 718 F.2d 842 (7th Cir.1983) (shortfall in production at liquid natural gas plant due to faulty component was "loss of use of tangible property") *with Bituminous Cas. Corp. v. Gust K. Newberg Constr. Co.,* 218 Ill.App.3d 956, 161 Ill.Dec. 357, 362–63, 578 N.E.2d 1003, 1008–09 (1991) (lost work days and other productivity losses allegedly due to inadequate ventilation system in office building did not represent "loss of use of tangible property" but merely purchaser's defeated expectations).

■ Even if the economic losses alleged in the Security complaint constituted "property damage" under the second prong of the policy definition, First Mercury would still have no contractual obligation to defend Sting. Exclusion (m) to the policies provides that CGL insurance does not apply:

> to loss of use of tangible property which has not been physically injured or destroyed *resulting from* (1) the delay or lack of performance by or on behalf of the named insured of any contract or agreement, or (2) *the failure of the named insured's products or work per-*

formed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured; but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury or the destruction of the named insured's product or work performed, by or on behalf of the named insured after such products or work have been put to use by any person or organization other than the insured.

(Emphasis added). Since Security's complaint is predicated on the failure of Patrol Command to perform as warranted or represented, whether falsely or negligently, by Sting, exclusion (m)(2) operates to bar coverage and thus defeats First Mercury's duty to provide Sting with a defense. Additionally, Sting does not benefit from the exception to the exclusion because the complaint does not allege "sudden and accidental injury" to Patrol Command. In *Trane,* the court confronted identical policy provisions and held that the insurer had no duty to defend where the underlying complaint alleged that the plant's diminished productivity was due to a defective component manufactured by the insured. 544 F.Supp. at 687.

Sting contends, however, that exclusion (m), when read together with the definition of "completed operations hazard," gives rise to an ambiguity in the policy language which should be resolved in favor of coverage. *See, e.g., Bituminous Cas. Corp. v. Sheets,* 239 Va. 332, 389 S.E.2d 696 (1990). The policies define "completed operations hazard" to include:

> bodily injury and property damage arising out of operations or *reliance upon a representation or warranty made at any time with respect thereto,* but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. 'Operations' include materials, parts or equipment furnished in connection therewith.

According to Sting, the ambiguity lies in the fact that this definition specifically grants coverage for reliance upon a representation or warranty made at any time, while exclusion (m) denies coverage for certain losses resulting from representations of the named insured.

Sting's reading of the provisions is correct but does not suggest an "irreconcilable ambiguity." The "completed operations hazard" describes a set of risks for which Sting is insured. However, Sting's coverage is subject to a series of exclusions, including exclusion (m). That exclusion removes from coverage only one subset of risks which would otherwise be covered as "completed operations": the loss of use of tangible property not otherwise damaged resulting from the failure of the insured's product or work to perform as promised. It does not exclude other risks resulting from reliance on the insured's representations with respect to products or work, such as physical injury to tangible property, other than the work or product itself.

For these reasons First Mercury's motion for summary judgment will be granted and Sting's motion for summary judgment will be denied.