**The DOW CHEMICAL COMPANY, Plaintiff,**

v.

**ASSOCIATED INDEMNITY CORPORATION; The American Insurance Company; Aetna Casualty & Surety Company; American Home Assurance Company; California Union Insurance Company; Central National Insurance Company of Omaha; The Home Insurance Company; International Surplus Lines Insurance Company; Midland Insurance Company; Underwriters at Lloyd's London; and Insurance Companies Subscribing Policies CU 10086, CU 10087, CU 10088, K 25298, and UGL 0519, Defendants.**

No. 85–CV–10037–BC.

United States District Court, E.D. Michigan, N.D.

Dec. 15, 1989.

Joseph L. Falik, Eric H. Lipsitt, Greg Smith, Wise & Marsac, Detroit, Mich., Philip S. Beck, Samuel A. Haubold, Michael P. Foradas, Kirkland & Ellis, Chicago, Ill., Samuel P. Jordan, R.W. Barker, Legal Dept. The Dow Chemical Co., Midland, Mich., for Dow.

Andrew Butz, Gary M. Elden, Charles S. Bergen, Irving C. Faber, Grippo & Elden, Chicago, Ill., Glenn F. Doyle, Carl H. Smith, Smith & Brooker, Bay City, Mich., for Assoc. Indem. & American Ins.

William M. Cohn, William T. Cahill, Matthew Gehringer, Phelan, Pope & John, Chicago, Ill., Floyd Wetmore, Francis, Wetmore & Groom, Midland, Mich., for Aetna Cas.

Randall Phillips, Proviser, Lichtenstein, Pearlman & Phillips, Southfield, Mich., for American Home.

James N. Martin, Victor Van Camp, Martin, Bacon & Martin, Mt. Clemens, Mich., for California Union.

Michael E. Thoits, Michael G. Costello, Plunkett & Cooney, Detroit, Mich., for Home Ins.

Timothy McVey, Sandra Young, Purcell & Wardrope, Chicago, Ill., Andrew B. Wachler, Mark S. Kopson, Andrew P. Wachler, P.C., Detroit, Mich., for Intern. Surplus.

Robert A. Alkema, Chairman, Michigan Property & Cas. Guar. Ass'n, Livonia, Mich., Andrew A. Alberti, Acting Sp. Deputy Superintendent of Insurance, Liquidation Bureau—State of New York Ins. Dept., New York City, for Midland Ins.

John B. Haarlow, Lord, Bissell & Brook, Chicago, Ill., George M. Tunison, Purcell, Tunison & Cline, Saginaw, Mich., for Central Nat. & Lloyd's.

## MEMORANDUM OPINION

CHURCHILL, Chief Judge.

### I. *Introduction*

This opinion supplements the Court's Memorandum Opinion filed September 7, 1989, *see Dow Chemical Co. v. Associated Indemnity Corp. et al.*, 724 F.Supp. 474 (E.D.Mich.1989) [hereinafter *Dow I*], which contains an overview of issues raised in this case but specifically addresses only the "trigger of coverage" issue. The focus herein is on the "number of occurrences" issue.

Sarabond-related claims expose Dow Chemical Company ("Dow") to hundreds of millions of dollars of potential liability, but most of the individual claims involve less than $2.5 million per claim. Because the insurance policies at issue limit indemnity coverage to $2.5 million per "occurrence" and because of the potential for unlimited liability from multiple "occurrences" within a policy year, the issue of what constitutes an "occurrence" has huge financial significance to the parties.[1]

Dow seeks a partial summary judgment that each building[2] in a claim or suit is a

---

1. Even if Dow clears all coverage hurdles, it will still be required to absorb a substantial share of the total losses by reason of deductibles or retentions, and by payment of premiums for auto-

matic reinstatement of coverage limits for policy years after 1969.

2. For the purpose of deciding this motion, the Court accepts Fireman's Fund's assertion that a

separate "occurrence," subject to separate deductibles or retentions and limits of coverage. Associated Indemnity Corporation and the American Insurance Company ("Fireman's Fund") contend that there is a fact question whether all buildings, or at least all buildings constructed after March of 1970, represent one occurrence. Fireman's Fund would have the Court either deny Dow's motion outright or defer consideration of the motion until completion of additional discovery. See Fed.R.Civ.P. 56(f). The excess carriers have made their separate views known, but have not briefed this issue.

## II. Defining the "Number of Occurrences" Issue

The "number of occurrences" issue is the subject of a recent annotation entitled *What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence*, 64 A.L.R. 4th 668 (1988). Many of the cases relied upon by the parties are referred to in the annotation. The insurance policies at issue here, like the insurance policies interpreted in the annotated cases, contain policy limits clauses in which essential terms are defined. The annotation suggests that there are three general views on the issue: (1) the policy limits clause refers to the cause or causes of the accident or occurrence (the "causation view"); (2) the policy limits clause refers to effect or result of the accident or occurrence (the "effect view"); (3) the policy limits clause refers to the liability triggering event (the "liability triggering event view"). *Id.* at 676–80.

Fireman's Fund advocates that the Court adopt the first view and further that there is a genuine issue of fact whether there was but one occurrence which resulted in all claims for all buildings, or at least all buildings constructed after March of 1970. Dow asserts that the Court is bound by controlling precedent to follow the second view.

Whichever view is ultimately embraced by the Court, the parties seem to recognize that Dow's motion for summary judgment must be granted unless (i) the applicable policy limits clauses refer to the cause or causes of the property damage *and* (ii) Dow's decision to market Sarabond without full disclosure of material information constituted the cause of property damage to all buildings constructed after the decision was made.[3] All other roads lead to the conclusion that, on facts which are not in dispute, each building in a claim or suit is a separate occurrence within the meaning of the applicable policies.

The Court's approach to resolving the issue involves three steps: (1) examine the controlling policy language to ascertain its apparent meaning; (2) examine the controlling and persuasive case law; and (3) apply the case law to the facts in this case and ascertain whether there is a genuine issue of material fact.

## III. The Policy Language

This suit concerns the rights and duties of Dow and Fireman's Fund under three different comprehensive general liability policies, referred to herein as the 1964, 1970, and 1974 policies.[4] With respect to the "number of occurrences" issue, the interpretation of similar language in the 1970 and 1974 policies is of particular significance to the parties.

In the 1970 and 1974 policies, an "occurrence" is defined as "an event ... which results ... in ... property damage[.]" *See Dow I*, 724 F.Supp. at 488–89 (Addendum

---

group of nearby structures constructed at or about the same time by or for one owner should be considered a single building.

**3.** Although discovery is not complete with respect to Dow's marketing of Sarabond, it is clear that there is substantial evidence to support Fireman's Fund's claim that sometime in the early 1970s, and perhaps as early as March of 1970, Dow made a decision to withhold material information about Sarabond from prospective

purchasers. There is no suggestion, however, that the negotiations leading to the purchase of Sarabond were not separately conducted with respect to each building.

**4.** The Court included pertinent policy language in Addendum B to *Dow I* which is relevant not only to the "trigger of coverage" issue, but also to the "number of occurrences" issue. *See Dow I*, 724 F.Supp. at 477.

B). Under the 1970 policy, an "event" includes "injurious exposure to conditions." *Id.* The reference to "event" in the 1974 policy includes "continuous or repeated exposure to conditions." *Id.* Furthermore, the property damage that must result from the event under the 1970 policy is "injury to or destruction of tangible property[.]" *Id.* The 1974 policy also includes "physical injury" in the definition of property damage. *Id.* Both policies provide that all property damage "arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence" for the purpose of determing the limit of Fireman's Fund's liability. *Id.* The policies also provide that Fireman's Fund will pay "all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which [the] insurance applies, caused by an occurrence[.]" *Id.*[5]

Consideration solely of the definition of "occurrence" in the 1970 and 1974 policies leads to two conclusions: (i) the policy language is consistent with the "causation view" and (ii) it is inconsistent with the "effect view." However, a reading of the definition of "occurrence" in conjunction with the rest of the policy language suggests a different conclusion. The insurer's duty to indemnify flows from the insured's *legal* duty to compensate a third-party for property damage. This reading suggests that an "event" within the meaning of the policy language must factually cause property damage and must also legally result in the insured's duty to pay damages. This construction of the policy is consistent with the "liability triggering event view."

A different conclusion may be reached under the language of the 1964 policy, where "occurrence" is defined to include "a single occurrence or a single accident, or a series of them arising out of one event or disaster." *Id.* Under the 1964 policy, an event causes the occurrence. The damage to property is the occurrence. This is consistent only with the "effect view."

Before turning to the case law, two other observations about the policy language are appropriate. First, the definition of "occurrence" in the 1974 policy contains a special provision that an "assault and battery committed by or at the direction of the insured in order to ... protect or defend persons or property shall be considered an occurrence." *Id.* Second, an insured's need for indemnity and defense may arise (i) from intentionally causing injury (e.g. assault), (ii) from reprehensible conduct (e.g. fraud), (iii) from other fault-based conduct (e.g. negligence) or (iv) from conduct without fault (e.g. abnormally dangerous activity). Under some circumstances, an insured's state of mind with respect to the property damage or personal injury may provide a complete defense to policy coverage. However, there is nothing in standard policy language which suggests that the intentional or unintentional nature of an insured's conduct is relevant to the identification of occurrences.

## IV. *Case Law*

### A. *Case Law Supporting the "Effect View"*

Dow relies primarily upon *Elston–Richards Storage Co. v. Indemnity Insurance Co. of North America*, 194 F.Supp. 673 (W.D.Mich.1960), *aff'd per curiam*, 291 F.2d 627 (6th Cir.1961), for the proposition that each separate injury is a separate occurrence. Dow asserts that because the trial court in *Elston–Richards* applied Michigan law and was affirmed, albeit without explanation, and because the Michigan appellate courts have not otherwise dealt with the issue, the decision is binding upon the Court in this case.

In *Elston–Richards*, the insured operated warehouse facilities. *Id.* at 673. During the term of the policy, the insured handled more than 50,000 Whirlpool appliances, over 4,000 of which were damaged by use of a single defective motorized lift truck. *Id.* at 674, 677. While the words "event" and "occurrence" were not de-

---

5. The parties have not suggested, nor does the Court find, that the minor differences in language between the 1970 and 1974 policies are significant with respect to the issues raised by the motion addressed in this opinion.

fined, the policy contained the following "Limits of Liability" provisions:

2. Limits of Liability. The company's aggregate liability for loss or damage arising out of all occurrences or events in any one policy year is limited to the amount specified in Item 4 of the declarations. The company shall not be liable hereunder for any claim or claims arising from any one event or occurrence unless the insured's total liability therefor, when determined, shall exceed the deductible amount stated in Item 4 of the declarations, in which event such stated amount shall be deducted from the insured's total liability, and the company shall be liable only in excess of such stated amount.

*Id.* at 674. The policy also included the following provision with respect to limits of liability:

Item 4. The limit of the company's liability under Insuring Agreement I shall be: * * * $250,000 subject to a deductible of $2,500.

*Id.* The district court, applying Michigan law, held that the injury to each of the 4,000 appliances arose from a separate event or occurrence so that the $2,500 deductible applied to each damaged appliance. *Id.* at 682.

The *Elston–Richards* policy did not distinguish clearly between physical damage and the legal obligation to pay damages as do the 1970 and 1974 Fireman's Fund policies at issue in this suit. The phrase "claim or claims arising from any one event or occurrence" in the *Elston–Richards* policy tends to gloss over the distinction between the factual cause of damage and the legal cause of liability. Nevertheless, since the court treated each injury to an appliance as an occurrence, the case is properly classified as supporting the view that the clause refers to the result or effect of an accident. *See* Annotation, *What Constitutes "each," "a single," "one," "anyone," "any," or an "accident or occurrence" Within Liability Policy Limiting Insurer's Liability to Specified Amount,* 53–55 A.L.R.2d Later Case Serv. 486, 489 (1987).

In *Michigan Chemical Corp. v. American Home Assurance Co.,* 728 F.2d 374, 379–80 (6th Cir.1984), a majority of the Sixth Circuit applying Illinois law recognized that while *Elston–Richards* might be precedent in Michigan, it was contrary to the overwhelming trend of cases. Judge Keith, however, viewed *Elston–Richards* as persuasive authority. *See id.* at 384 (Keith, J., dissenting).

The Court rejects *Elston–Richards* as binding or persuasive precedent in this case for several reasons: (1) the policy language is distinguishable; (2) *Elston–Richards* was not a products liability case; (3) it did not involve claims by multiple parties; (4) it was decided before the trend of modern cases which favors the view that the clause refers to the cause or causes of the accident or occurrence.

B. *Case Law Supporting the "Liability Triggering Event View"*

 In the Court's view, a construction of the policy limits clause which comports with the reasonable expectations of an insured and which is consistent with the entire language of the 1970 and 1974 policies is that an "occurrence" is determined by reference to the event triggering liability on the part of the insured. The leading case expressing this view of the law in a multiple-claimant products liability property damage case is *Maurice Pincoffs Co. v. St. Paul Fire and Marine Insurance Co.,* 447 F.2d 204 (5th Cir.1971). In *Pincoffs,* many birds died as a result of consuming contaminated bird seed that was sold by an importer to eight grain dealers. *See id.* at 205. The Fifth Circuit determined that the word "occurrence" in the importer's liability policy referred to events triggering the importer's liability. Since the importer made eight sales of bird seed, there were eight separate occurrences. *See id.* at 206.

The same result would be obtained in most cases whether a court looks to factual cause or legal cause in determining if a claim arises from a single or multiple occurrences. Here, the Court would have to disregard the overwhelming trend of authority to conclude that the "liability trig-

gering event view" represents the law of Michigan.

## C. *Case Law Supporting the "Causation View"*

In *Michigan Chemical,* the Sixth Circuit cited substantial authority for the proposition that an "occurrence," for the purpose of applying coverage limitations, is determined by reference to the cause or causes of the damage and not to the number of injuries or claims. *See* 728 F.2d at 379. Several other cases, each of which is analyzed in the remainder of this opinion, are supportive of this general proposition. *See Mead Reinsurance v. Granite State Insurance Co.,* 873 F.2d 1185 (9th Cir.1989); *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.,* 676 F.2d 56 (3d Cir.1982); *Champion International Corp. v. Continental Casualty Co.,* 546 F.2d 502 (2d Cir.1976), *cert. denied,* 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977); *Air Products and Chemicals, Inc. v. Hartford Accident and Indemnity Co.,* 707 F.Supp. 762 (E.D.Pa.1989); *Owens–Illinois, Inc. v. Aetna Casualty and Surety Co.,* 597 F.Supp. 1515 (D.D.C.1984); *Transport Insurance Co. v. Lee Way Motor Freight, Inc.,* 487 F.Supp. 1325 (N.D.Tex.1980); *Cargill, Inc. v. Liberty Mutual Insurance Co.,* 488 F.Supp. 49 (D.Minn.1979), *aff'd,* 621 F.2d 275 (8th Cir.1980); *Union Carbide Corp. v. Travelers Indemnity Co.,* 399 F.Supp. 12 (W.D.Pa.1975).

Unfortunately, the statement of this general proposition means little when, as frequently is the case, there are multiple causes of multiple injuries to multiple parties. In such cases, the outcome of the policy limitation controversy depends upon identification of the controlling common cause. Two mutually consistent approaches have emerged in these cases. One approach treats an event as the common cause of multiple injuries only when it is the proximate, uninterrupted, and continuous cause of the injuries. *See Michigan Chemical,* 728 F.2d at 379; *Appalachian Insurance,* 676 F.2d at 61; *Air Products,*

707 F.Supp. at 773; *Owens–Illinois,* 597 F.Supp. at 1525. In the other approach the courts focus on the underlying circumstances that result in the claims for damages. *See Champion International,* 546 F.2d at 505–06; *Air Products,* 707 F.Supp. at 773; *Owens–Illinois,* 597 F.Supp. at 1525; *Cargill,* 488 F.Supp. at 53.

## D. *Application of These Causation Approaches*

### 1. *Products Liability Cases*

A common thread runs through the published products liability cases relied upon by Fireman's Fund. In each case, the insured continuously and repeatedly produced and sold an intrinsically harmful product. In *Union Carbide,* the insured produced a resin-former oil that eventually caused plastic consumer products to smell bad. *See* 399 F.Supp. at 14. In *Champion International,* the insured produced vinyl-covered paneling, which split apart when the panels were installed in house trailers and motor homes. *See* 546 F.2d at 504. In *Cargill,* the product was a nutrient medium called Grits 3500, which was less effective for a particular purchaser's use after the manufacturing process was changed. *See* 488 F.Supp. at 50. In *Owens–Illinois* and *Air Products,* the insured sold asbestos products that caused injuries. *See Owens–Illinois,* 597 F.Supp. at 1517; *Air Products,* 707 F.Supp. at 764. The insured in *Air Products* also produced welding rods that caused injury from exposure to fumes and gas.[6]

The *Union Carbide* case, however, is in some respects unique. The resin-former oil sold by the insured was a by-product of a dripoline refining process. *See* 399 F.Supp. at 14. Union Carbide's use of ethyl acrylate in the processing of dripoline caused the by-product to have certain properties. The incidental production of an oil with such properties caused no harm. It was the continuous production and sale of the by-product for use as a resin-former oil that caused the harm. Union Carbide sold all of the defective resin-former oil that

---

**6.** In *Air Products,* the district court was concerned with the "number of occurrences" issue

for the purpose of determining retrospective premiums. *See* 707 F.Supp. at 771.

gave rise to claims to one customer, Neville Chemical Company ("Neville"). In the underlying lawsuit by Neville against Union Carbide, the jury found, and the trial and appellate courts affirmed, that "such use of ethyl acrylate was negligent in that created an unreasonable risk of harm to Neville and the users of Neville's products[.]" *Id.* Moreover, this unreasonable risk of harm was created by the failure of Union Carbide to warn Neville of the presence of the unknown and unsuspected reactive ingredient, the consequences of which were not only foreseeable, but actually anticipated by Union Carbide. *Id.*

> In *Union Carbide,* the court found that: a single 'accident' occurred under the language of the Aetna policy, at the time when Union [Carbide] made its decision to allow the ethyl acrylate to remain in the dripolene stream at Seadrift, on about May 31, 1963. This decision, plus a failure to warn, is the established proximate cause of all the subsequent damages suffered, by a great variety of firms and individuals at various stages in the subsequent stream of distribution.

*Id.* at 21.

The other products liability cases relied upon by Fireman's Fund do not look to the making of a decision as a cause of the resulting harm. They simply hold, in effect, that if the continuous production and sale of an intrinsically harmful product results in similar kinds of injury or property damage, then all such injury or property damage results from a common occurrence.

In contrast, the insured's liability in *Michigan Chemical* was predicated upon the harm caused by one of its products, but the product itself was not intrinsically harmful. *See* 728 F.2d at 376. The insured, Michigan Chemical, produced and distributed both a magnesium oxide livestock feed and a flame retardant that contained the toxin PBB. *Id.* The substances were packaged in nearly identical brown bags; the sole difference was that they were stenciled "Nutrimaster" and "Firemaster" respectively. *Id.* Michigan Chemical made one or more shipments of "Firemaster," rather than "Nutrimaster," to Farm Bureau Ser-

vices. Farm Bureau Services then mixed "Firemaster" with regular feed and sold the resulting product to dairy farmers. This led to the destruction of a large number of cattle, swine, sheep, chicken and other farm animals that had ingested the PBB. The farmers filed hundreds of claims against Michigan Chemical and Farm Bureau Services. *Id.* Clearly, the decision to package two different products in similar containers, and the act of doing so, were common causes of the ensuing damage. The court, however, recognized that the decision and the act were not the proximate, uninterrupted, and continuous causes of the damage. *Id.* at 383. Rather, the court ruled that each shipment of PBB was the proximate, uninterrupted, and continuous cause of property damage to the claimant who received parts of such shipment and, therefore, each shipment would be a separate occurrence. *Id.*

It does not appear from the briefs that Fireman's Fund argues that Sarabond is an intrinsically harmful product. Sarabond caused damage, according to Fireman's Fund, because Dow withheld critical information about the risks involved in its use and about the manner in which the risks could be minimized or avoided. Recognizing that Dow dealt separately with different builders, Fireman's Fund pins its argument on Dow's marketing decision to withhold critical information about Sarabond from builders. Accordingly, Fireman's Fund relies primarily upon *Union Carbide* and supports its argument by reference to three civil rights cases.

### 2. *Civil Rights Cases*

*Lee Way Motor Freight,* 487 F.Supp. 1325, and *Appalachian Ins. Co.,* 676 F.2d 56, are employment discrimination cases. In *Lee Way Motor Freight,* the United States brought suit against Lee Way on behalf of several black employees who were victims of Lee Way's pattern and practice of racial discrimination. *See* 487 F.Supp. at 1326. In *Appalachian Ins. Co.,* the underlying suit against the employer, Liberty Mutual Insurance Company, was a class action based upon a company policy of discrimination against women. *See* 676

F.2d at 58. As a matter of substantive law, the unlawful pattern and practice in *Lee Way Motor Freight* and the unlawful policy in *Appalachian Insurance Co.* were not only the proximate, uninterrupted, and continuous causes of all injuries suffered, such pattern and practice and policy were the essential elements of the established claims.

In *Mead Reinsurance*, the insured was the city of Richmond, California. *See* 873 F.2d at 1187. Several actions were brought against the city pursuant to 42 U.S.C. § 1983. *Id.* As a matter of substantive law, a municipality is exposed to liability under 42 U.S.C. § 1983 for the acts of its employees only if the employee misconduct was pursuant to a policy or custom. *See, e.g., Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The court in *Mead Reinsurance* found that liability in the underlying police abuse cases was based upon the city's policy of condoning similar acts of police brutality. *See,* 873 F.2d at 1188. Due to nuances in the substantive law of civil rights the cases provide little or no support for the proposition that the adoption of a policy to mislead customers is a single occurrence in a products liability case.

### V. *Application of Case Law to the Facts*

The products liability cases discussed herein do not support a claim that damage to separate buildings containing Sarabond resulted from a single occurrence. With the benefit of hindsight, the result in *Union Carbide* was correct, but the reasoning was flawed. Although there was but one occurrence with respect to the damages suffered by Neville and its customers, that occurrence was not the decision to use ethyl acrylate in its dripoline line. *See* 399 F.Supp. at 21. If Union Carbide was producing resin-former oil for resale, then its continuous and repeated production of this intrinsically harmful product was the occurrence. If resin-former oil was an accidental by-product that Union Carbide would have produced even if there was no market for it, then the continuing sale of

the resin-former oil to the single customer without full disclosure would be the single occurrence. In either situation, the conduct is the occurrence, not the decision to act or not to act.

This case is fundamentally different from *Union Carbide* and the products liability cases relied upon by Fireman's Fund. There is no evidence that Sarabond is an intrinsically harmful product. Furthermore, Union Carbide's misrepresentation was to one customer; Dow's purported misrepresentations allegedly have been to many purchasers. This latter distinction, however, is not outcome determinative.

There is no case cited by the parties in which the facts closely parallel the facts in this case. *Michigan Chemical* is significant, however, because of its holding that a decision to take action is not an uninterrupted proximate cause of the injury that occurs when the action is eventually taken. *See* 728 F.2d at 383.

■ The Court concludes that each building in a claim or suit is a separate occurrence within the meaning of each policy at issue. The Court's decision rests primarily upon the foregoing analysis of case law as applied to the facts of this case. The same result is obtained by looking at particular language of the 1974 policy. While it deals only with assaults caused by the insured, the language in the 1974 policy, that an assault and battery committed at the direction of the insured shall, for certain purposes, be considered as an occurrence, is strongly suggestive that the assault, not the direction of the insured to commit the assault, would be the occurrence. *See Dow I,* 724 F.Supp. at 488 (Addendum B). If an employee committed two assaults in furtherance of one direction from his employer, there would be two occurrences. To be consistent, the commission of fraud upon two parties pursuant to the direction of management would have to be two occurrences.

### VI. *Conclusion*

Given the total, undisputed circumstances of this case, the Court is compelled to conclude that each building constructed

with Sarabond is a separate "occurrence" within the meaning of the Dow–Fireman's Fund insurance policies. Accordingly, an appropriate order granting Dow's motion for summary judgment on this issue will be entered in due course.