**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 97-50215
_____

H E BUTT GROCERY COMPANY,

Plaintiff - Appellant,

versus

NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA,

Defendant - Appellee.

Appeal from the United States District Court
For the Western District of Texas

August 26, 1998

Before WIENER, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

H.E. Butt Grocery Company ("HEB") brought suit against National Union Fire Insurance Company ("National Union") seeking a declaratory judgment to determine its rights and responsibilities under a comprehensive general liability insurance policy that National Union issued to HEB. The district court granted summary judgment in favor of National Union. We affirm.

I

This insurance coverage dispute arises from an HEB employee's

sexual abuse of two children in an HEB grocery store. While both children have been compensated for the sexual assaults, this dispute concerns how the loss will be allocated between HEB and National Union. Under the terms of its insurance policy, HEB is its own primary insurer))it must pay a self-insured retention ("SIR") limit of $1,000,000 per "occurrence" as that term is defined in the policy. National Union is then responsible for the payment of damages after HEB has satisfied its SIR limit for each occurrence. The question for this Court is how many "occurrences" arise from the two sexual assaults.

The relevant facts for this appeal are not disputed. In 1994, an HEB employee sexually assaulted two different children on different days in the restroom of an HEB store. The two sexual assaults took place approximately one week apart and involved the same employee and the same store. The family of each child filed claims against HEB in unrelated suits in Texas state court. Each suit alleged that HEB was negligent in several respects, including failing to provide adequate security, failing to warn, failing to adequately supervise its employees, and in hiring and retaining employees when it knew or should have known that its employees were unable to provide a safe environment in its store. The lawsuits also alleged that HEB knew that the same employee had committed an act of "untoward sexual conduct" in the past with a different child at another store and that the sole corrective action taken was to transfer the employee to another store location. HEB eventually

-2-

settled each lawsuit for $1,000,000, the amount of its SIR limit per occurrence under the insurance policy.

HEB then brought suit against National Union in state court seeking a declaratory judgment that its payment of $1,000,000 to settle the first lawsuit satisfied its SIR obligation for both suits because they arose from the same "occurrence"))*i.e.,* its negligence in overseeing its pedophilic employee. National Union removed the case to federal court on diversity grounds and sought summary judgment, arguing that the two separate instances of sexual abuse constituted two occurrences under the policy. The district court agreed and granted summary judgment in favor of National Union. HEB now appeals the grant of summary judgment.

## II

We review the district court's grant of summary judgment *de novo*, taking the facts in the light most favorable to the non-moving party*. See New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996). We will affirm a summary judgment ruling if we are "convinced, after an independent review of the record that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Yeager v. City of McGregor*, 980 F.2d 337, 339 (5th Cir. 1993); *see also* FED. R. CIV. P. 56(c). Here, both parties agreed below that the only question to be decided was whether two unrelated molestations of different children on two separate dates were one or two

"occurrences" under the terms of the policy.[1]

Because this case comes before us through diversity jurisdiction, we apply Texas law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79, 58 S. Ct. 817, 822, 82 L.Ed. 518 (1938). A contract of insurance is generally subject to the same rules of construction as other contracts. *See National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 554 (Tex. 1991). The court's primary concern is to give effect to the written expression of the parties' intent. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). If the written contract is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and will be enforced as written. *See National Union Fire Ins. Co. v. CBI Indus., Inc.* 907 S.W.2d 517, 520 (Tex. 1995).

If the court is uncertain as to which of two or more meanings was intended, a provision is ambiguous. *See Butler & Binion v.*

---

[1]    On appeal, National Union raises a question of fact as to whether the sexual abuse was "expected" by HEB. If the injury was "expected" from the standpoint of the insured (*i.e.*, HEB), there is no "occurrence" under the terms of the insurance policy. *See Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1395-96 (8th Cir. 1996) (holding that sexual abuse was expected by Diocese, and thus, no occurrence under identical policy language). National Union, however, failed to raise this issue in the district court below, and we will not address it. *See Yeager v. City of McGregor*, 980 F.2d 337, 339 (5th Cir. 1993) ("We may affirm a summary judgment on a ground not utilized by the district court if it was raised below and has proper support in the record."); *see also Cullen/Frost Bank v. Commonwealth Lloyd's Ins. Co.*, 852 S.W.2d 252 (Tex. App. 1993, writ denied) (rejecting insurer's claim that damages were "expected" by insured because claim was not raised in the trial court on insurer's motion for summary judgment).

-4-

*Hartford Lloyd's Ins. Co.*, 957 S.W.2d 566, 570 (Tex. App. 1995, writ denied). An ambiguity in a contract is either "patent" or "latent." *See CBI Indus., Inc.* 907 S.W.2d at 520. "A patent ambiguity is evident on the face of the contract. A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *Id.* (citation omitted). Only after a court has determined a contract is ambiguous can it consider the parties' interpretations. *See id.* at 520. When a contract is not ambiguous, the court will construe the contract as a matter of law. *See Coker v. Coker*, 650 S.W.2d 391, 393-94 (Tex. 1983).

III

The outcome of this case depends on the meaning of "occurrence" under the policy. HEB argues that "occurrence" is ambiguous and that its interpretation is a reasonable construction of the term. Whether a provision is ambiguous is a question of law for the court to decide. *See CBI Indus., Inc.* 907 S.W.2d at 520. HEB does not specify whether it believes that the definition of "occurrence" is "patently" or "latently" ambiguous; consequently, we will consider each proposition in turn.

The policy defines "occurrence" as follows:

> 'Occurrence' means an event, including continuous or repeated exposure to conditions, which result[s] in Personal Injury or Property Damage during the policy period, neither expected nor intended from the standpoint

-5-

of the Insured. All Personal Injury or Property Damage arising out of the continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

This definition of "occurrence" is virtually identical to the definition contained in standard-form commercial liability policies. *See American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 854 n.21 (Tex. 1994). Texas courts have routinely applied the term without concluding that it is patently ambiguous. *See, e.g., Foust v. Ranger Ins.* Co., No. 04-97-00714-CV, 1998 WL 82793, *3-4 (Tex. App. Feb. 27, 1998, n.w.h.); *Transport Ins. Co. v. Lee Way Motor Freight, Inc.*, 487 F. Supp. 1325, 1327 (N.D. Tex. 1980) (applying Texas law). Not surprisingly, HEB cannot cite a single Texas case that has found a patent ambiguity in the definition of "occurrence." We conclude that the definition of "occurrence" in the policy is not ambiguous on its face. *See Foust*, 1998 WL 82793, at *5 (concluding that virtually identical definition of "occurrence" was "clearly define[d]" and not ambiguous).

Although no Texas court has interpreted "occurrence" in the context of a pedophilic employee and the sexual abuse of two different children, we must make an *Erie* guess as to how the Texas Supreme Court would decide the issue. *See Farm Credit Bank v. Guidry*, 110 F.3d 1147, 1149 (5th Cir. 1997) (when state law is silent, court must make "Erie guess" as to how state supreme court would rule). A latent ambiguity does not arise simply because the

-6-

parties advance conflicting interpretations of the term; an ambiguity exists only when the term cannot be given a definite and certain legal meaning and more than one reasonable interpretation exists. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Thus, we must decide whether Texas law prescribes a definite legal meaning to "occurrence" under the circumstances in this case.

Texas courts agree that the proper focus in interpreting "occurrence" is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects. *See*, e.g., *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204, 206 (5th Cir. 1971) (applying Texas law and holding that the events giving rise to liability constitute the "occurrence"); *Goose Creek Consol. I.S.D. v. Continental Cas. Co.*, 658 S.W.2d 338, 339 (Tex. App. 1983, no writ) (explaining that a majority of courts apply a "cause" analysis to determine whether a set of facts involve only one or several occurrences); *Lee Way Motor Freight*, 487 F. Supp. at 1330 (explaining that "[t]he great majority of courts have adopted a 'cause' analysis"). The question under Texas law becomes whether HEB's negligent employment relationship with its pedophilic employee, rather than the two acts of sexual abuse, "caused" the injuries to the two children and gave

rise to HEB's liability.[2]

HEB's argument))that we can ignore the immediate cause of each child's injuries and look only to the underlying negligent supervision))is similar to one rejected by the Texas courts in *Burlington Insurance Co. v. Mexican American Unity Council, Inc.*, 905 S.W.2d 359, 362 (Tex. App. 1995, no writ). In *Burlington*, a resident of a youth home sued the youth home, alleging that it negligently allowed her to leave its premises unsupervised and that she was assaulted by an unknown person as a result. At issue in the coverage dispute between the youth home and the insurance

---

[2]    In his concurring opinion, Judge Benavides suggests that examining the "cause" of the injuries and examining the events "giving rise" to liability are mutually exclusive tests for determining the number of "occurrences." I disagree, and contrary to Judge Benavides's characterization of this opinion, I do not reject one in favor of the other. Indeed, both common sense and legal parlance suggest that these approaches are related aspects of the same test or principle. *See Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56, 60-61 (3d Cir. 1982) (considering the cause of the injuries in conjunction with the events giving rise to liability to determine the number of "occurrences"). To the extent that Judge Benavides rejects a test that examines the "cause" of the injuries for determining the number of "occurrences," the case law rests squarely against him. *See, e.g., Goose Creek Consol. I.S.D. v. Continental Cas. Co.*, 658 S.W.2d 338, 340 (Tex. App. 1983, no writ) ("Courts in federal and foreign jurisdictions have applied either a 'cause' or effect' analysis in determining whether a set of facts involved only one or several occurrences."); *see also Michigan Chem. Corp. v. American Home Assurance Co.*, 728 F.2d 374, 379-80 (6th Cir. 1984) (noting that "[t]he vast majority of courts . . . have concluded that . . . the number of occurrences for purposes of applying coverage limitations is determined by referring to the cause or causes of damage and not to the number of injuries or claims."); *Appalachian Ins. Co.*, 676 F.2d at 60 ("Liberty acknowledges that the determination of whether an occurrence is single or multiple properly depends on whether there is a single cause or multiple causes for the losses sustained.").

company was the policy's assault and battery exclusion, and whether the insurance company had a duty to defend the youth home in the suit brought by the injured child. The youth home argued that its negligent supervision was an independent "cause" of the child's injuries, and therefore, that the policy exclusion for assault and battery did not apply. The youth home argued "that there is concurrent causation in this case: (1) the negligence of [the youth home] in allowing Zertuche to leave the premises; and (2) the assault by an unknown assailant." The court rejected this argument, concluding that because the child's injuries arose out of the assault and battery, the claim was excluded from coverage under the policy. The court explained that the "cause" of the damages for purposes of the insurance policy was the actual assault and battery. "Without the underlying assault and battery, there would have been no injury and no basis for suit against [the youth home] for negligence. . . . [T]he origin of [the injured child's] damages is the assault and battery." *Id.* at 363.

We reached a similar conclusion under Texas law in *Commercial Union Insurance Co. v. Roberts*, 7 F.3d 86, 88-89 (5th Cir. 1993). In *Roberts*, two children who were sexually molested by a doctor brought suit against the doctor alleging that he was negligent for, among other things, failing to obtain treatment for his pedophilia and failing to have adequate supervision while he taught young children at Sunday School. Again, the issue before the court was

-9-

the "cause" of the children's damages, and similar to HEB's argument here, the children "attempt[ed] to avoid the inescapable fact that the sexual molestation caused the injuries." *Id.* at 89. We explained that "[e]ach and every allegation arises out of the alleged acts of sexual molestation. The claims of negligence are not independent causes-in-fact of the injuries." We concluded that "[w]ithout the underlying sexual molestation there would have been no injury and obviously, no basis for a suit against [the doctor] for negligence." *Id.* at 89-90; *see also Johnson v. Sawyer*, 47 F.3d 716, 730-31 (5th Cir. 1995) (*en banc*) (holding that the negligent supervision tort "came into Texas law by way of analogy to negligent entrustment" which requires that liability be predicated on the tortious conduct of the person to whom the vehicle was entrusted).

HEB argues that the above-mentioned decisions are not relevant here because they do not concern the construction of the policy term "occurrence." This argument misses the point; the principle underlying *Burlington*, *Roberts*, and *Johnson* indicates that when the underlying basis for liability is negligent supervision, yet the damage is caused by an intervening intentional tort, the court cannot look past the immediate cause of the damage for purposes of the insurance policy. Thus, the two independent acts of sexual abuse "caused" the two children's injuries and gave rise to HEB's separate and distinct liability in each case. *See Johnson*, 47 F.3d

-10-

at 731 ("[I]n negligent hiring or supervision cases, the general rule is clearly that 'liability . . . must be predicated upon the wrongful act or omission of the employee . . . .") (interpreting Texas law).

Further undercutting HEB's argument is the fact that there are insurance policies available with a sexual misconduct endorsement that would treat both incidents of sexual abuse as one occurrence under the circumstances. In *Preferred Risk Mutual Insurance Co. v. Watson*, 937 S.W.2d 148, 149 (Tex. App. 1997, writ denied), the insured purchased an endorsement which stated that: "All acts of sexual misconduct by one person, or two or more persons acting together, or any breach of duty causing or contributing to such acts will be considered one occurrence in determining our liability under this section." HEB did not purchase such an endorsement, however, and chose instead to purchase the standard liability policy which defines "occurrence" by the cause of the injuries. *Cf. Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 104 (7th Cir. 1996) (explaining that "'continuous or repeated exposure to conditions' sounds like language designed to deal with asbestos fibers in the air, or lead-based paint on the walls, rather than with priests and choirboys").

In addition, where insurance provisions are identical across jurisdictional borders, as they are here, Texas courts strive to interpret the provisions uniformly. *See CBI Indus., Inc.* 907

S.W.2d at 522; *see also Dickson v. State Farm Lloyds*, 944 S.W.2d 666, 668 (Tex. App. 1997, n.w.h.). While the decisions of other courts are not binding precedent under Texas law, most courts that have considered the question have concluded that the sexual molestation of different children constitutes separate occurrences. *See, e.g., Lee*, 86 F.3d at 104-05 (Rhode Island law) (explaining that the insurance company conceded the issue); *Society of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1364-65 (5th Cir. 1994) (Louisiana law) ("*Catholic Church*") (holding that the molestation of different children constitutes separate occurrences); *Interstate Fire & Cas. Co. v. Archdiocese of Portland*, 747 F. Supp. 618, 624 (D. Or. 1990) (Oregon law) ("Each time this negligent supervision presented Father Laughlin with the opportunity to molest a different child, the Archdiocese was exposed to new liability."), *rev'd on other grounds*, 35 F.3d 1325 (9th Cir. 1994); *S.F. v. West Am. Ins. Co.*, 463 S.E.2d 450, 452 (Va. 1995) (Virginia law) (holding that the molestation of different children constitutes separate occurrences); *State Farm Fire & Cas. Co. v. Elizabeth N.*, 12 Cal. Rptr. 2d 327 (Cal. Ct. App. 1992) (California law) ("[W]e conclude that the insured's liability to each child was one occurrence[.]"). These decisions support our conclusion that two independent molestations of two

children equals two occurrences.[3]

HEB attempts to distinguish this Court's conclusion in *Catholic Church* by arguing that our holding was based on a finding that "occurrence" was ambiguous, and that we must similarly find an ambiguity under the circumstances of this case. In addition to the fact that *Catholic Church* applied Louisiana, rather than Texas law, we disagree with HEB's conclusion that *Catholic Church* found "occurrence" to be ambiguous as to the molestation of different children. In *Catholic Church*, we were faced with an insurance coverage dispute between the Diocese of Lafayette and its insurers which arose from two miscreant priests' repeated molestation of 31 different children. Similar to the case at hand, the dispute centered around the meaning of "occurrence" under the policy; we considered the identical question to the one before us here))namely, whether the priests' molestation of 31 children constituted 31 separate occurrences.[4] The insurance policy's

---

[3]    We recognize that some of the opinions that find separate occurrences for the molestation of each different child discuss the issue only in dicta. Because we are interpreting Texas law, however, we are interested only in the courts' reasoning and their analytical approach. We do not consider the cases to be binding precedent.

[4]    In addition, we were faced with a second, more complicated question as to whether the repeated molestation of a single child over time constituted one on-going occurrence or separate occurrences for each subsequent act of molestation. As to this question, we concluded that the repeated molestation of the same child was one on-going occurrence for each policy period in which a molestation occurred. *See Catholic Church*, 26 F.3d at 1365-66.

definition of "occurrence" was almost identical, and the policy contained a self-insured retention provision requiring the Diocese to pay a deductible on a per-occurrence basis (just as HEB's policy does). Moreover, Louisiana law, like Texas, requires that when a term in an insurance policy has uncertain application, the policy be interpreted in favor of the insured. *See Catholic Church*, 26 F.3d at 1364. Because of the self-insured retention limit, the interpretation favorable to the Diocese of Lafayette was that all of the sexual abuse arose from one occurrence))its negligent supervision of the priests.

After noting the interpretation favorable to the Diocese, we nonetheless held that the priest's molestation of each child was a separate "occurrence" under the policy (*i.e.*, 31 occurrences). *See id.* We came to this conclusion even though it was *not* the conclusion favorable to the Diocese because Louisiana law made it clear that the damage to each child was a separate occurrence. In short, we could not have concluded that the definition of "occurrence" had an uncertain application under Louisiana law.[5]

---

[5] A recent Texas decision discussing our opinion in *Catholic Church* misunderstands our holding in that case. *See Preferred Risk Mut. Ins. Co. v. Watson*, 937 S.W.2d 148, 150 (Tex. App. 1997, writ denied). Although the Texas court found *Catholic Church* to be "inapposite" because the insurance policy at issue had a sexual misconduct endorsement, *see supra* at 10, the court stated that we interpreted the insurance policy in favor of the insured in *Catholic Church*. We disagree with the Texas court's interpretation of our holding. While there is dicta in *Catholic Church* stating that the definition of occurrence "affords little assistance" and is "malleable" and "perplexing," we did not interpret the policy in

Instead, at least with respect to the molestation of different children, "occurrence" had a clear and definite meaning: the molestation of each child constituted a separate occurrence. *See Catholic Church*, 26 F.3d at 1364 ("Following *Lombard*, 'the damage to each [child] is a separate occurrence.'") (quoting *Lombard v. Sewerage & Water Bd.*, 284 So. 2d 905, 915-16 (La. 1973)).

HEB further argues that the final sentence of the definition of "occurrence"))all injury "arising out of the continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one occurrence"))indicates that two sexual assaults on two different children is only one "occurrence" when they are predicated on an employer's negligence. HEB confuses the circumstances of its case (*i.e.,* two independent acts of sexual abuse on *two different children*) with the second question we considered in *Catholic Church*, which was whether multiple acts of sexual abuse on *the same child* constituted one or multiple occurrences. *See supra* note 4. We concluded in *Catholic Church* that multiple molestations of the same child was one occurrence per policy period. *See Catholic Church*, 26 F.3d at 1365-66 ("When a

favor of the insured with regard to the molestation of each different child. As this opinion notes, our conclusion in *Catholic Church*))that the molestation of each child was a different occurrence))was directly contrary to the interpretation favorable to the insured Diocese in that case. Our holding therefore indicates that Louisiana law did not find the question uncertain or subject to more than one interpretation. *See Catholic Church*, 26 F.3d at 1364.

priest molested a child during a policy year, there was both bodily injury and an occurrence, triggering policy coverage. All further molestation of that child during the policy period arose out of the same occurrence."). As the opinion in *Catholic Church* itself makes clear, the conclusion that multiple molestations of the same child is only one occurrence is easily distinguishable from the conclusion regarding separate acts of molestation of different children. Where an employee repeatedly molests the same child, each new act of abuse does not necessarily give rise to new liability for the employer. In the case at hand, however, HEB is exposed to new liability for each separate and independent act of molestation on a new child.

HEB's argument "depicts a pedophilic [employee] as similar to hazardous waste: living next to a church from which oil has seeped into the ground is one 'occurrence' no matter how long the conditions exist." *See Lee*, 86 F.3d at 103. In response to a similar argument, the Seventh Circuit explained that "[a] priest is not a 'condition' but a sentient being, and of course the victim was never 'exposed' to the Diocese's negligent supervision." *Lee*, 86 F.3d at 104. Here, each child was "exposed" to the pedophilic employee, not to HEB's negligent employment practices. "[T]he occurrence is not the Archdiocese's negligent supervision of Father Laughlin as such, but the 'exposure' of the boy to the negligently supervised priest[.]" *Archdiocese of Portland*, 35 F.3d at 1329.

-16-

Although the Seventh Circuit recently questioned our analysis in *Catholic Church* relating to the repeated molestation of the same child, *see Lee*, 86 F.3d at 104-05 ("Following the fifth and ninth circuits, both [parties] assume that every child abuse case produces either one 'occurrence' or many according to the number of victims and policy years involved. We do not think that Rhode Island would find either end of this continuum attractive."), the court appeared to agree that the molestation of different children would constitute separate occurrences:

> At oral argument, counsel for Lloyd's conceded that if [the priest] had abused two boys in a single policy year, that would be two 'occurrences.' Presumably two priests abusing four boys would be four occurrences. From the victim's perspective, this makes sense. Each loss is independent, and this understanding affords both the victim and the insured Diocese one full 'occurrence' worth of coverage.

*Lee*, 86 F.3d at 104. The court noted that "a single negligent act undoubtedly can produce multiple 'occurrences' if the injuries are independent." *Id.*

This is the same type of "cause" analysis undertaken by other courts. While "a single occurrence may result in multiple injuries to multiple parties over a period of time . . .[,] if one cause is interrupted and replaced by another intervening cause, the chain of causation is broken and more than one occurrence has taken place." *Home Indem. Co. v. City of Mobile*, 749 F.2d 659, 662 (11th Cir. 1988); *see also Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982) (holding that to determine the number of

-17-

occurrences "the court asks if '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage'") (quoting *Bartholomew v. Insurance Co. of N. America*, 502 F. Supp. 246, 251 (D. R.I. 1980), *aff'd*, 655 F.2d 27 (1st Cir. 1981)). Here, it is clear that each child's injuries are independent and caused by the separate acts of sexual abuse. We agree with the Ninth Circuit that "the terms of the policy make clear that negligent supervision alone, whether ongoing or not, would not trigger any obligation on the part of the insurers. Rather it is the [] 'exposure' of the boy to the negligently supervised priest, resulting in injury, that provides the basis for indemnification." *Archdiocese of Portland*, 35 F.3d at 1329.

We recognize that courts have not been uniform in their interpretation of "occurrence" under similar circumstances. The Virginia Supreme Court, without much analysis, found that "occurrence" was ambiguous with regard to the molestation of multiple children, but then concluded that the molestation of each child was a separate occurrence because that was the interpretation favorable to the insured in that case. *See S.F. v. West Am. Ins. Co.*, 463 S.E.2d 450, 452 (Va. 1995). The Nevada Supreme Court recently reached the opposite conclusion: it did not find "occurrence" to be ambiguous, yet the court concluded that the molestation of different children constituted only one occurrence when premised on the county's underlying negligence. *See Washoe*

-18-

*County v. Transcontinental Ins. Co.*, 878 P.2d 306, 308-10 (Nev. 1994). Even though the court recognized that "the actions of the individual wrongdoers are the most direct causes of harm for the victims," it "conclude[d] that the County's negligence in the licensing process and in its attendant duties to investigate and monitor [the day-care center] constitutes a single occurrence for purposes of liability." *Id.* We find, however, that the Nevada court's approach conflicts with the greater weight of authority and "attempt[s] to avoid the inescapable fact that the sexual molestation caused the injuries." *Roberts*, 7 F.3d at 88-90. Moreover, under Texas law, even where courts from different jurisdictions are split as to the interpretation of a particular insurance provision, "[n]either conflicting views of coverage, nor disputation is sufficient to *create* an ambiguity." *Union Pac. Resources v. Aetna Cas. & Sur.*, 894 S.W.2d 401, 401 (Tex. App. 1994, writ denied) (emphasis in original).

HEB fails to recognize that the interpretation of "occurrence" favorable to the insured in this case will not necessarily be the interpretation favorable to the insured in the next case. Because HEB serves as its own primary insurer (because of its SIR limit), it wants to call the separate molestations one "occurrence" to limit the number of self-insured retentions that it must pay. *See, e.g., Catholic Church*, 26 F.3d at 1363 ("[T]he larger the number of 'occurrences,' the greater the loss borne by the primary insurers

. . . ."). The Seventh Circuit noted, however, that "[w]inners and losers will change with the circumstances. . . . [I]f tomorrow the victim's loss exceeds the maximum coverage for a single occurrence, the roles will be reversed. The [insurance company] would want to call the sexual abuse a single occurrence to cap its own exposure, while the Diocese would favor multiple occurrences in order to maximize its insurance coverage." *Lee*, 86 F.3d at 104; *see also Elizabeth N.*, 12 Cal. Rptr. 2d at 328-29 (demonstrating that where insurance company's liability was capped at $200,000 per occurrence, it argues that multiple acts of sexual abuse constitute only one occurrence).

The Virginia Supreme Court's decision in *West American Insurance Co.* is a perfect case in point. The insured-employer in that case argued that the molestation of each child was a separate "occurrence" under an identical policy definition, while the insurance company argued that the employer's negligence in hiring, supervising and retaining its pedophilic employee constituted only one occurrence. *See West Am. Ins. Co.*, 463 S.E.2d at 452. The court ultimately construed "occurrence" in favor of the insured and concluded that the molestation of each child was a separate occurrence))giving the insured full coverage for each molestation up to the policy's per-occurrence maximum (instead of coverage for only one "occurrence"). *See id.* Thus, the cases make clear that whether the definition of "occurrence" is favorable to the insured

-20-

depends on whether the parties are arguing over the maximum coverage per occurrence or the number of self-insured retentions that must be paid. While this opinion rejects HEB's interpretation of "occurrence," the definition of "occurrence" remains a mixed blessing to both insurers and insured.

IV

We recognize that the financial burden of settling the sexual abuse lawsuits will fall heavily on HEB under the terms of its policy; "[h]owever unfortunate such a result would be from the perspective of [the insured], it is dictated by the terms of the policies [it] purchased." *Archdiocese of Portland*, 35 F.3d at 1331. HEB chose to purchase an insurance policy that provided for a self-insured retention limit of $1,000,000 per occurrence. *Cf. Diocese of Winona*, 89 F.3d at 1390 (SIR limit of $100,000); *Lee*, 86 F.3d at 102 (SIR limit of $100,000); *Archdiocese of Portland*, 35 F.3d at 1327-28 (SIR limit ranging from $75,000-$100,000); *Catholic Church*, 26 F.3d at 1362 (SIR limit of $100,000); *Washoe County*, 878 P.2d at 307 (SIR limit of $50,000). It is this high SIR limit that requires HEB to bear the entire burden of settling the children's two lawsuits for $1,000,000 each.

HEB cannot successfully argue that the two separate acts of sexual abuse on two different children constitute only one "occurrence" under the policy. Neither Texas law nor the policy language allow this result. We reach this conclusion not by

-21-

looking to the number of injuries or the number of victims,[6] but rather by looking to the two independent events that gave rise to HEB's liability and caused the injuries. HEB's argument that it should not have to bear the $1,000,000 burden for each act of sexual abuse is without merit. We conclude that the insurance policy is not ambiguous under the circumstances of this case; under Texas law, two independent acts of sexual abuse injuring two children are two occurrences. The summary judgment in favor of National Union is AFFIRMED.[7]

WIENER, Circuit Judge, concurs in the judgment only.

---

[6] We express no opinion as to the number of "occurrences" that would arise if an employee molested two children at the same time in the same incident. That question is not before us and remains for another day.

[7] National Union's Motion to Certify Questions of Law is denied as moot.

BENAVIDES, J., concurring.


Although I agree that Texas courts would focus on the events giving rise to liability to determine the number of occurrences, I do not agree that the question under Texas law is "whether HEB's negligent employment relationship with its pedophilic employee, rather than the two acts of sexual abuse, 'caused' the injuries to the two children and gave rise to HEB's liability." ___ F.3d at ___.  I would hold that the appropriate test for counting occurrences under Texas law is a "liability-triggering event" test rather than the "immediate cause" test applied by Judge Garza. Applying a liability-triggering event test yields the same result reached by Judge Garza.  There were two occurrences: the employee's molestation of each child.

Both *Goose Creek Consol. ISD v. Continental Cas. Co.*, 658 S.W.2d 338, 339 (Tex. App.— Houston [1st Dist.] 1983, no writ) and *Maurice Pincoffs Co. v. St. Paul Fire & Marine Insurance Co.*, 447 F.2d 204 (5th Cir. 1971), are best understood as applying a "liability-triggering event" test, rather than the "immediate cause" test adopted in the majority opinion.[8]  In *Goose Creek*, the

---

[8]*See Dow Chem. Co. v. Associated Indem. Corp.*, 727 F. Supp. 1524, 1528 (E.D. Mich. 1989); Comment, Tung Yin, *Nailing Jello to a Wall: A Uniform Approach for Adjudicating Insurance Coverage Disputes in Products Liability Cases with Delayed Manifestation Injuries and Damages*, 83 CAL. L. REV. 1243, 1254 (1995).  I

court focused on the particular language of the policy at issue in that case, which defined occurrence in terms of a "single event," and concluded that each of two fires was a separate event and thus that there were two occurrences under the policy.  658 S.W.2d at 339.  Although the court noted that a majority of states had adopted a "cause" test for occurrence, the court did not in fact apply a cause test, but rather relied on its understanding of the term "single event" in determining how many occurrences there were. *Id.* at 340.

This circuit's approach was similar in *Pincoffs*.  The *Pincoffs* court viewed the occurrence as the "event" giving rise to liability from the insured's point of view.  *Pincoffs* involved the sale by Pincoffs of contaminated bird seed to dealers who in turn sold the seed to bird owners, whose birds then died.  The liability-triggering event, from Pincoffs's point of view, was Pincoffs's sale of contaminated seed rather than the original contamination of the seed (apparently by a third party) or the subsequent sales by the dealers.  This holding was not based on a conclusion that the contamination of the seed or subsequent sales did not cause the bird owner's injuries or that the sale was an "immediate" or "intervening" cause, but rather on the idea that the sales were

---

recognize that there is room for disagreement on this point.  *See* Michael J. Murphy & Robert E. Wilder, *The "Event" Debate in Asbestos-Related Excess of Loss Reinsurance Disputes*, 31 Tort & Ins. L.J. 687, 702 (1996).

"the events or incidents for which Pincoffs is liable." 447 F.2d at 206. Indeed, the court clearly acknowledged that "the damage to the birds resulted from the contamination of the bird seed." *Id.* at 207.

Similarly, in this case, the children's injuries resulted from HEB's negligent hiring of the pedophilic employee and from the employee's acts. But the events that gave rise to liability, even from HEB's point of view, were the employee's molestations of each child. Notably, however, applying the "immediate cause" test to the facts in *Pincoffs* would produce a different result: the immediate cause of the bird owner's injuries was not Pincoffs's sale to the dealers but the dealers' sale to the bird owners (or even more particularly, the feeding of the birds). Nonetheless, the liability-triggering event from Pincoffs's point of view was its sale of the seed to the dealers. Thus, *Pincoffs* supports the result that Judge Garza reaches here, but in my view is inconsistent with the test he would adopt.

Moreover, the cause test set forth by the district court in *Transport Insurance Co. v. Lee Way Motor Freight, Inc.*, 487 F. Supp. 1325, 1237 (N.D. Tex. 1980), cited by Judge Garza, is inconsistent with the result reached in this case. *Lee Way* involved a company-wide racially discriminatory policy. The court held that the occurrence was not each individual instance of discrimination that resulted from the discriminatory policy, but

rather the adoption of the policy itself. By analogy, the occurrence in this case would be the negligent hiring and supervision of a pedophilic employee instead of the two instances in which that pedophilic employee harmed the children of customers.

Indeed, the Nevada Supreme Court in *Washoe County v. Transcontinental Insurance Co.*, 878 P.2d 306 (Nev. 1994), applied the causal analysis employed in *Lee Way* and reached a conclusion contrary to that reached by Judge Garza. The Nevada court held that even though multiple children had been molested by an employee negligently hired by the county, there was only one occurrence from the county's point of view (the county's negligent hiring). *See id.* at 308. The *Washoe County* court actually cites *Lee Way* in support of its conclusion that there was a single occurrence. *See id.* The *Lee Way/Washoe County* approach bears little resemblance to the approach taken in *Pincoffs* and *Goose Creek*.

In addition to being more consistent with *Pincoffs* and *Goose Creek*, a liability-triggering event test would also be more consistent with the specific policy language in this case, which defines "occurrence" in terms of an "event." The liability-triggering event test also has the virtue of avoiding the acrobatics required to conclude that the molester's actions rather than HEB's negligence caused the injuries to the molested children. Judge Garza relies on *Burlington v. Mexican Am. Unity Council*, 905 S.W.2d 359 (Tex. App.—San Antonio 1995, no writ), and *Commercial Union Ins. Co v. Roberts*, 7 F.3d 86 (5th Cir. 1993), for the proposition that occurrences should be counted with reference to the immediate cause of the injuries. Both *Burlington* and *Roberts*, however, involved the applicability of intentional tort policy exclusions (in *Burlington*, an exclusion for assault and battery; in *Roberts*, for intentional torts generally). These cases, which deal with what happens when the covered cause of harm is not independent of the excluded cause of harm, do not shed any light on counting the number of occurrences under an insurance policy. Suppose, for example, in *Pincoffs*, that the bird seed dealer's insurance policy had contained coverage for its liability arising out of sales to pet store owners, but excluded coverage for the death of livestock resulting from the ingestion of contaminated food. Under *Burlington* and *Roberts*, there would have been no coverage for the birds' deaths under the policy because the ingestion of

-27-

contaminated food (the immediate, but excluded cause) and the sales to pet store owners (the covered cause) were not independent causes of the birds' deaths. That does not mean, however, that, absent the exclusion, the number of occurrences would be based on each bird's ingestion of the contaminated seed rather than the sales as the *Pincoffs* court held. In other words, whether coverage is negated because the immediate cause of harm is excluded from coverage (and the covered cause is not independent of the excluded cause) has no necessary connection to the way occurrences should be counted under the policy.

Finally, I disagree with Judge Garza's conclusion that this circuit in *Society of the Roman Catholic Church v. Interstate Fire & Cas. Co.*, 26 F.3d 1359 (5th Cir. 1994), found that the term "occurrence" was not ambiguous. ___ F.3d ___ n.4 (criticizing *Preferred Risk Mut. Ins. Co. v. Watson*, 937 S.W.2d 148, 150 (Tex. App.—Fort Worth 1997, writ denied)). To the extent, as Judge Garza suggests, that the *Catholic Church* panel held that the definition of occurrence *unambiguously* requires that occurrences be counted from the injured party's point of view, Judge Garza's opinion here conflicts with *Catholic Church*. The definition of occurrence he would adopt (keyed to "immediate cause") is inconsistent with the *Catholic Church* panel's effects test. This inconsistency can be demonstrated by applying the two definitions to the facts in *Anchor Casualty Co. v. McCaleb*, 178 F.2d 322 (5th Cir. 1949). In *McCaleb*,

an oil well exploded, injuring the property of four people who brought suit. Like the *Catholic Church* court, the *McCaleb* court adopted an "effects" test for counting the number of occurrences under Texas law, holding that number of occurrences must be determined based on the property damage suffered by each individual property owner as a result of the explosion. *See McCaleb*, 178 F.2d at 325. Applying the test adopted by *Catholic Church* and *McCaleb* and examining the claim from the point of view of the injured parties, there were four occurrences in *McCaleb*. Under Judge Garza's definition, however, there was only one occurrence because there was only one immediate cause of the injuries (the oil well explosion). Thus, Judge Garza cannot simultaneously conclude that the *Catholic Church* case found the definition of occurrence to be unambiguous.

Applying the liability-triggering event test to the facts of *McCaleb* also leads to a finding that there was but one occurrence. Unlike Judge Garza, however, I would conclude that the panel in the *Catholic Church* case did in fact believe that the definition of occurrence was subject to more than one interpretation. The court noted that the meaning of the phrases "a continuous or repeated exposure to conditions" and "substantially the same general conditions" is "malleable" and that the meaning of "occurrence" "can be perplexing in application." *Id*. at 1364. The court further explained:

An "occurrence" could be the church's continuous
negligent supervision of a priest, the negligent
supervision of a priest with respect to each child, the
negligent supervision of a priest with respect to each
molestation, or each time the Diocese became aware of a
fact which should have led it to intervene, just to name
a few possibilities.

*Id.* Nevertheless, the panel was bound by the Louisiana Supreme Court's decision in *Lombard v. Sewerage & Water Bd. of New Orleans*, 284 So.2d 905 (La. 1973), in which the court held that the number of occurrences under Louisiana law must be determined from the point of view of the injured parties (*i.e.*, applied an "effects" test).

In sum, because the liability-triggering event test is more consistent with Texas law and with the language of policy in this case and is more easily applied, I respectfully concur.